2020 IL App (3d) 160169

Opinion filed September 18, 2020

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2020

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 14th Judicial Circuit, Whiteside County, Illinois. |
| Plaintiff-Appellee, | ) ) | Appeal No. 3-16-0169 Circuit No. 12-CF-138 |
| v. | ) ) ) | The Honorable John L. Hauptman, |
| LOUIS C. HARRIS, | ) | Judge, presiding. |
| Defendant-Appellant. | | |

_____

JUSTICE CARTER delivered the judgment of the court, with opinion.
Justice Holdridge concurred in the judgment and opinion.
Justice McDade dissented, with opinion.

_____

**OPINION**

¶ 1     After a jury trial, defendant, Louis C. Harris, was convicted of unlawful delivery of a controlled substance within 1000 feet of a school (720 ILCS 570/401(c)(2), 407(b)(1) (West 2012)) and was sentenced to 14 years in prison. Defendant appeals, arguing that (1) the trial court erred in denying defendant's pretrial request for the appointment of new standby counsel after current standby counsel was allowed to withdraw, (2) he was denied a fair trial when the trial court failed to instruct the jury on accomplice-witness testimony, (3) he was denied a fair

trial by the trial court's refusal to allow the jurors to take notes during defendant's trial, and (4) this case should be remanded for the trial court to conduct a proper preliminary inquiry into defendant's *pro se* posttrial claim of ineffective assistance of counsel. We affirm the trial court's judgment.

¶ 2                                                   I.FACTS

¶ 3        In April 2012, defendant was charged with unlawful delivery of a controlled substance within 1000 feet of a school, a Class X felony, and a related offense. As to the Class X felony, the charging instrument alleged that on March 16, 2012, defendant delivered more than 1 gram, but not more than 15 grams, of a substance containing cocaine within 1000 feet of St. Mary's Grade School in Sterling, Whiteside County, Illinois, in violation of the law.[1] A pretrial bond report indicated that defendant had a lengthy criminal history and had been convicted of approximately eight prior felonies. The trial court initially appointed the public defender's office to represent defendant. Defendant's appointed attorney, James Heuerman, appeared at several pretrial conferences with defendant and filed various documents on defendant's behalf. During the course of the pretrial proceedings, defendant was transferred or released to the Department of Corrections (DOC). Defendant was later released by the DOC and failed to appear in this case. The trial court issued a warrant for defendant's arrest. As a result of defendant's failure to appear and the outstanding warrant, no action was taken in this case for over two years. In December 2014, defendant was arrested on the outstanding warrant and brought back into court on this case. Defendant was still represented by his appointed attorney, Heuerman, at that time.

---

[1]The related charge was essentially the same except that the related charge alleged that the weight of the substance was less than one gram.

¶ 4         In January 2015, defendant appeared at a pretrial conference with Heuerman and told the trial court that he wanted to represent himself and that he was requesting that standby counsel be appointed to assist him. The trial court informed defendant that if it allowed defendant to represent himself, it would not appoint standby counsel. Defendant persisted in his request to represent himself. The trial court admonished defendant about the right to counsel and about self-representation. As part of that admonishment, the trial judge told defendant, "it is my discretion to appoint standby counsel and I want you to know up front, on the record, that I do not appoint standby counsel." Defendant indicated that he understood the admonishments and waived his right to counsel. The trial court granted defendant's request to proceed *pro se*. Later that same month, defendant, while acting *pro se*, filed a motion for discovery and to quash the arrest warrant. The motion was set for a status hearing. At the status hearing, the trial court again admonished defendant about representing himself. The trial court granted defendant's request for discovery but denied defendant's request to quash the arrest warrant and explained to defendant that the arrest warrant had already been served.

¶ 5         In February 2015, a pretrial conference was held, and defendant requested that the public defender's office again be appointed to represent him. The trial court granted defendant's request. Attorney Elwin Neal from the public defender's office was assigned to defendant's case. Approximately two months later at another pretrial conference, defendant told the trial court that he wanted to represent himself. The trial court admonished defendant about self-representation, and defendant waived the right to counsel. The trial court granted defendant's request to proceed *pro se*. The following conversation ensued over whether standby counsel would be appointed:

              "THE COURT: Now only because off the record Mr. Neal inquired

              whether or not I would be inclined to appoint standby counsel, I will tell you that

3

I normally do not appoint standby counsel and I can do that within my discretion. However, Mr. Neal mentioned something off the record about your, your abilities, specifically your ability to read and write. Okay?

Go ahead, Mr. Neal.

MR. NEAL: I told him what my concerns were about his—he tells me that he can read.

THE COURT: Okay. Okay. All right. Fair enough.

Are you asking whether or not I appoint standby counsel?

THE DEFENDANT: Uhm, yes, Your Honor.

THE COURT: Okay.

You understand that standby counsel, they wouldn't be able to do anything for you, they would be sitting during the trial and answering any questions that you might have. Do you understand that?

THE DEFENDANT: Okay. Yes, sir.

THE COURT: Okay. They can't conduct, they can't represent you at trial. Do you understand that?

THE DEFENDANT: Yes, Your Honor.

THE COURT: I will look for some input from you as well, Mr. Neal.

MR. NEAL: I'm sorry?

THE COURT: I will look for some input from you because you have represented him for at least two or three months, anyway.

What's your position with regard to standby counsel?

4

MR. NEAL: I don't—I think it would behoove Mr. Harris to have some assistance. The Court has already expressed that conducting a trial is not an easy matter. It is not for, to be taken lightly and it is not easy. I think Mr. Harris would benefit from having the assistance of the public defender to be standby during.

THE COURT: Do you want to weigh in on this at all?

MS. JOYCE [THE PROSECUTOR]: I would just say he is facing two counts, for which if convicted he is sentenced, he must submit to Class X sentencing. I think he is taking a huge risk, even going to this level and with standby counsel, however he is choosing to do that, so I would think at the very least he should have some assistance.

THE COURT: I told you this once before, sir, I'm not a big fan of standby counsel, but I also respect the opinion that's been provided by both attorneys.

I will appoint standby counsel for you, and it will be Mr. Neal."

¶ 6 In May 2015, defendant filed a motion for full and complete discovery from the State. At a subsequent status hearing on the motion, defendant asked to confirm that he had received all of the discovery from the State and was told that there was more discovery that he had not yet received. Defendant also requested that he be provided with access to the law library so that he could prepare his case. The trial court granted that request.

¶ 7 At a pretrial conference later that month, the trial court again admonished defendant about representing himself, and defendant indicated that he still wanted to do so. The trial court inquired of defendant about discovery and about defendant's ability to conduct legal research. The following conversation ensued:

5

"THE COURT: Now, when you see the discovery and when you do any legal research, do you need some assistance with that? In other words, do you need assistance of anyone reading things to you or—anything in that regard?

THE DEFENDANT: Well, more than likely, in terms of taking different meanings of a word, you know, like a dead something, you know, the definition, you know or…

THE COURT: Different definitions?

THE DEFENDANT: Yes.

THE COURT: Have you tried to make any arrangements with Mr. Neal to speak with him about going over the discovery with you since he's been appointed standby counsel?

THE DEFENDANT: No, he don't seem like he got the time.

THE COURT: Okay. Well, we'll—I'll check on that, too. So, understand. I mean, he's—he's there to—to assist you at the trial, obviously. Okay?

THE DEFENDANT: Okay.

THE COURT: You've chosen to represent yourself, and I just went through a litany of reasons why it's probably not a great idea for you to do that, but that's your choice, because you have the constitutional right to do that.

On the other hand, I don't—You know, I don't bend over backwards, just because the fact that you're representing yourself. I will provide you with opportunities, knowing that you have—you know, that you're in custody, and you have limitations about your movements.

THE DEFENDANT: Yes.

6

THE COURT: But that's—that's—that's the extent of it. You understand that?

THE DEFENDANT: Yes."

¶ 8     At a pretrial conference the following month, the trial court again admonished defendant about the right to self-representation, and defendant again indicated that he wanted to represent himself. Defendant complained to the court that he was not getting enough time in the law library to adequately prepare his case. The trial judge told defendant that he would have another discussion with the jail personnel and that he would inform them that defendant was to be given ample law library time. The trial court asked defendant if he had any expertise in reviewing what he intended to review, and defendant responded, "[w]ell, yeah, I got some, not expertise, but I just kind of understand that some of the statute and the chapters that I'm charged with, that I could use in my defense, sir."

¶ 9     Later during that same pretrial conference, the trial court asked defendant if there was anything else that defendant wanted to discuss with the court. The following conversation ensued:

"THE DEFENDANT: Uhm, there was—Standby counsel, he came to me, he kind of like cussed at me and he said he, he don't have to do nothing for me, so, you know. I asked him for certain stuff, you know, not much, but he seemed like he is not willing to work with me so I don't think he should be standing by me.

THE COURT: Well let's, let's put this in perspective. You've chosen to represent yourself, the only reason that I have appointed standby counsel is to allow you to have someone who would be present with you at trial so that during

7

the course of trial if you have any questions that you want to ask him, you would be allowed to do that. He is not going to try the case for you, however.

\* \* \*

And you may—we all have personality differences with everybody but I mean he, he is extremely competent counsel, and for the purpose, for the limited purposes that you have counsel in the first place, Mr. Neal certainly far exceeds what you would need.

THE DEFENDANT: I understand that, Your Honor, but we seem to argue more than, that we can come to an agreement, so. So I ain't trying to argue with nobody.

\* \* \*

THE COURT: But the point is that, you know, he is not there to tell you what you think you want to hear. He is there to explain to you any questions that you might have and what, what the legal ramifications may or may not be. Okay.

MR. NEAL: If the Court would permit, maybe the Court would like me to speak or be quiet, if the Court would permit, in context, the discussion and I guess the disagreement that Mr. Harris and I have had is because he specifically requested that I contact the State's Attorney's Office and make certain proposals, which I've done.

He called my office indicating that he wanted to take those proposals, and we set up a date and then he told me once the date was set, that suppose he is not ready. So what I've gotten is a lot of vacillation from him. He tells me what he

8

wants to do one day and the next day it is something entirely different. So there is a certain amount of frustration with it."

¶ 10        In July 2015, attorney Neal filed a motion to withdraw as standby counsel. In the motion, Neal stated that he and defendant were "in conflict and confusion" over standby counsel's role in the case. A hearing was held on the motion a few days later. In discussing the ongoing conflict between he and defendant, attorney Neal stated, in pertinent part:

> "Mr. Harris subsequently came back in court and asked the Court that he be permitted to represent himself. On those occasions in which I've gone over to the jail to visit Mr. Harris, and even prior to that Mr. Heuerman, Mr. Harris, when asked to look at certain discovery information, would always come up with the reason that he couldn't read it because he didn't bring his glasses. As a consequence of that I came to the conclusion, that—and apparently mistakenly—that he couldn't read and perhaps not write.
>
> Subsequently we were, I was appointed again through the public defender's office to represent Mr. Harris in a standby capacity. I thought that that would be of some benefit to him.
>
> Subsequent discussions with Mr. Harris leads me to conclude that I'm of absolutely no benefit to him. He has told the Court that he wants to represent himself, yet at the same time from my perspective he is asking the public defender's office in essence to do things as though they were representing him as an attorney.

\* \* \*

He called me here, I think it was last week, and following a series of exchanges I hung up on him. I told Mr. Harris, 'F*** you. Don't call my office anymore.'

With that in mind, and with my own amount of time, I don't think I can even adequately represent him in a standby capacity.

Mr. Harris thinks he is not only smart, but smarter than most of us by half and if he wants to represent himself, which he has indicated that he does, then he should be entrusted and have the responsibility for handling his case in its entirety and not lean on me or the public defender's office to represent him in any capacity at all.

He can't have it—

***

—both ways."

¶ 11　　After confirming that defendant had no objection to attorney Neal's motion to withdraw, the trial court discussed with defendant the appointment of new standby counsel. The following conversation ensued:

"THE COURT: And Mr. Harris, the only reason I appointed standby counsel, which is something out of the ordinary for me, I don't generally appoint standby counsel for an individual who has chosen to represent themselves, frankly for this very reason, the only reason I did this, and I probably should have inquired in more detail with you at the time that I appointed standby counsel, I took Mr. Neal's representation at that time that you had some difficulty reading and writing.

10

I'm now told that you really, that you really don't have that much difficulty reading and writing; is that correct?

THE DEFENDANT: I don't know where you get that idea from, number 1. I don't know why he thought that.

THE COURT: Again, the representation was made and that's the reason why I did what I did.

So I'm going to ask you, are you, are you—so that the record is clear—are you asking me to appoint standby counsel?

THE DEFENDANT: Uhm, yes. You can have someone else, other than Mr. Neal, because he is like, like I said we had problems. He wants to argue with me, he wants to tell me, don't call him. He wants to cuss at me, and if he want[s] to be part of the defense and he want[s] to, you know, help me with this case, he is not helping me like that. That's, you know, that's not fair to me.

THE COURT: As I told you, I only appoint standby counsel in the most unusual type situations and you have now told me that the reason why I appointed standby counsel was an inaccurate representation. So frankly, sir, I'm going to deny your request for standby counsel. You can still represent yourself if that's what you wish to do.

THE DEFENDANT: Yes, sir.

THE COURT: Is that what you want to do?

THE DEFENDANT: Yes, sir.

* * *

11

THE COURT: So the record is clear, I'm denying the Defendant's request for standby counsel because I believe now that in fact I was mistaken and Mr. Harris is able to read and write."

¶ 12　　　　The trial court again admonished defendant about self-representation, and defendant told the trial court that he wanted to represent himself. At a pretrial conference later that month, defendant yet again indicated that he wanted to represent himself, and the trial court again admonished defendant about doing so. Turning to other matters, defendant tried to argue some of the evidence that he had received in discovery to get the charge dismissed, stating that the evidence raised a reasonable doubt. The trial court informed defendant that he was using the wrong process and explained some of the rules of criminal procedure to defendant. Both defendant and the State indicated to the trial court that they were ready for trial, and a jury trial was set for the following month. Acting *pro se*, defendant later filed what he titled as a "Motion for Effect of reasonable doubt." The State filed a motion for a pretrial ruling on the admissibility of evidence pertaining to defendant's prior convictions.

¶ 13　　　　In August 2015, a hearing was held on the pending motions. Prior to conducting the hearing, the trial court admonished defendant about self-representation, and defendant indicated that he still wanted to represent himself. The trial court addressed defendant's motion first and explained to defendant the process of trial, the State's burden of proof, and the presumption of innocence. The trial court next considered the State's motion *in limine* and ruled that the State could use defendant's 2008 burglary conviction for impeachment purposes at defendant's trial if defendant testified. Upon inquiry by the court, defendant provided a list of his witnesses for the circuit Clerk to subpoena for the trial and told the court that all of his witnesses were character

12

witnesses. The State indicated that it would be filing a motion to exclude the testimony of those witnesses.

¶ 14    Moving on to other matters, the State asked the trial judge if he wanted a note-taking instruction for defendant's jury trial. The trial judge commented:

> "The jury may or may—the jury could be allowed to take notes during the trial, that's up, frankly it's up to me, and I will tell you that I'm not a big fan of note taking. And the reason is, is because I am concerned that when people take notes they are concentrating on the thing that they are taking a note on and miss something else during the course of the trial. So I am not going to allow the jurors to take notes."

¶ 15    The State later filed its motion to exclude the testimony of defendant's character witnesses, and a hearing was held on the motion. At the outset of the hearing, the trial court asked defendant if he still wanted to represent himself, and defendant indicated that he did. The State argued that the testimony of defendant's character witnesses was irrelevant and should be excluded. Defendant confirmed that all of his witnesses were character witnesses and did not offer a counterargument to the State's motion. After considering the matter, the trial court granted the State's motion and excluded the testimony of defendant's character witnesses.

¶ 16    Addressing other matters, the State moved to dismiss the related charge that had been filed against defendant. The trial court granted that motion. Defendant asked the court if what defendant needed to do was to move to dismiss the Class X felony. The trial court reminded defendant that defendant had chosen to represent himself and told defendant that the court was not going to give defendant any legal advice on how to proceed. Upon inquiry by the court, defendant confirmed that he was ready for trial.

13

¶ 17    The following day, with the jury trial date rapidly approaching, the trial judge had defendant brought back into court so that he could admonish defendant yet again about self-representation. After the admonishments were completed, defendant again told the court that he wanted to represent himself.

¶ 18    A few days later, on August 18, 2015, defendant's jury trial began. Prior to the start of the trial, the trial court again admonished defendant about self-representation, and defendant again persisted in representing himself. Defendant did not renew his request for standby counsel at that time. During *voir dire*, defendant asked some of the potential jurors various questions about religion and asked other potential jurors about whether they would discriminate against anyone. After the jury was selected, the trial court admonished the jury that the court did not allow note-taking during the trial because the court was concerned that a person who was taking notes might miss some of the testimony that was being presented. The State and defendant gave their opening statements.

¶ 19    During the evidence portion of the trial, the State presented the testimony of several witnesses and admitted some exhibits. The evidence that was presented indicated that on the date in question, the police had a confidential informant, Allen Nelson, make a controlled purchase of cocaine from defendant. The purchase took place in the apartment of Ann Curran, where defendant also lived. Curran was defendant's girlfriend at the time and was present in the apartment during the drug transaction. Curran's apartment was located within 1000 feet of St. Mary's Grade School. Defendant was arrested after the delivery took place. He admitted to the police that he acted as a middleman in some drug transactions and that he received between $20 and $40 for each transaction that he facilitated. The substance that defendant delivered was tested by a forensic chemist and tested positive for cocaine with a weight of 1.06 grams. Those

14

facts were established by the testimony of Allen, Curran, some of the police officers involved, and the forensic chemist. All of those witnesses, except for Nelson, testified on August 18, 2015. Nelson testified the following day.

¶ 20　　　　The only witnesses that defendant cross-examined were the main police officer involved, Curran, and Nelson. Although many of defendant's questions were objected to by the State for lack of foundation or for other reasons, defendant was able to elicit that he met Nelson through Curran; that defendant, Nelson, and Curran used to smoke crack cocaine together in Curran's apartment; that Nelson had provided Curran and defendant with cocaine to use in the past; that Nelson had persuaded Curran to buy him some cocaine or to have defendant buy Nelson some cocaine; and that Nelson had been calling and begging defendant to sell him some crack cocaine.

¶ 21　　　　On August 18, 2015, after the jury recessed for the day, the trial court, the State, and defendant discussed certain matters pertaining to the trial. The trial court explained to defendant the process of how jury instructions were selected and prepared. The trial court told defendant in pertinent part:

> "So, at the time that we do the conference on instructions, Ms. Joyce [the prosecutor], I'm sure, will be kind enough to have the instructions that she thinks are appropriate to be submitted. Since these are my instructions to the jury, I will review those instructions with a mind's eye towards whether or not any particular instructions that I think you might be interested in should be given. So I will help you out to that extent, any way. But, that conference on instructions is to go through the instructions that will be eventually given to the jury. They are pretty straightforward, there isn't anything that is unusual about these instructions."

15

¶ 22    On August 19, 2015, the second day of trial, the State presented Nelson's testimony and then rested its case. After the State rested, defendant elected not to testify and chose not to present any evidence.The trial court held a jury instruction conference. During the conference, the trial court asked defendant if he wanted the instruction given that the jurors were unable to consider the fact that defendant did not testify in arriving at their verdict. The trial court explained that instruction to defendant, and defendant told the trial court that he wanted the instruction to be given. Other than that particular instruction about which the trial court had asked defendant, defendant did not present or request any specific jury instruction. The trial court asked defendant if there was any other instruction that defendant thought should be given, and defendant responded that there was not.

¶ 23    When the jury instruction conference was finished, the jury returned to the courtroom, and the State and defendant gave their closing arguments. The State argued to the jury that it had proven the charge beyond a reasonable doubt. Defendant argued to the jury that the case was a clear case of informant entrapment. Defendant stated further to the jury:

> "Uhm, uhm, predisposition and disposition, the People of the State and the informant. They planned, they planted, manipulation, manipulation, persuasion, perpetrators, offenses and crimes in the minds and heart of the defendant.
>
> All the evidence, the informant, all the elements of the informant, persistent requests, I hope and pray that your deliberation is in favor of the defendant."

¶ 24    After closing arguments had concluded, the trial court instructed the jury. Of relevance to this appeal, one of the instructions that the trial court gave the jury was Illinois Pattern Jury Instructions, Criminal, No. 1.02 (approved July 18, 2014) (hereinafter IPI Criminal No. 1.02),

16

which pertained to witness testimony in general. The trial court did not, however, give the jury Illinois Pattern Jury Instructions, Criminal, No. 3.17 (approved Oct. 17, 2014) (hereinafter IPI Criminal No. 3.17), which pertained specifically to accomplice-witness testimony. Upon completion of the jury instructions, the jury began its deliberations. Twenty minutes later, at about 10:50 a.m., the jury returned a verdict and found defendant guilty of the charged offense. The trial court ordered a presentence investigation (PSI) report, and the case was continued for sentencing.

¶ 25    Approximately a week later, defendant filed *pro se* motions for a copy of the trial transcripts and for a cap on sentencing. A status hearing was later held on the motions. At the hearing, defendant requested that the public defender's office be appointed to represent him. The trial court granted that request, and attorney Heuerman again took up his representation of defendant. Heuerman filed a first amended posttrial motion and later filed a second amended posttrial motion. In the second amended posttrial motion, Heuerman asserted, among other things, that the trial court erred in allowing defendant to represent himself at trial because defendant lacked the mental capacity to conduct his own defense. Heuerman asked, therefore, that defendant be granted a new trial.

¶ 26    In February 2016, a hearing was held on the second amended posttrial motion. After listening to the oral arguments of the attorneys, the trial court denied the motion. A sentencing hearing was held. Of relevance to this appeal, defendant's PSI report indicated that defendant had a lengthy criminal history and had approximately seven prior felony convictions. During the course of the sentencing hearing, while discussing the factors in aggravation and mitigation, the trial court commented:

17

"Throughout the entirety of these proceedings, while there were times in which Mr. Harris was, in fact, represented by counsel and counsel complained about his attitude, I found him nothing but respectful during the course of any court proceeding that we had. I found that he argued the points that he wanted to argue coherently. While they may not have been drafted articulately, but he got his point across. When I had to ask questions to clarify things, he—he—he clarified what he was trying to accomplish. And while I'm sure he wasn't happy with all the decisions that I made with regard to that, he accepted those decisions, left the courtroom without any show of disrespect."

At the conclusion of the sentencing hearing, the trial court sentenced defendant to 14 years in prison.

¶ 27        Attorney Heuerman subsequently filed a motion to reconsider sentence. A hearing was held on the motion the following month. At the outset of the hearing, the trial court discussed a disagreement that had arisen between defendant and attorney Heuerman. The following conversation ensued:

"THE COURT: Off the record, Mr. Harris requested that he speak with me as he was entering the courtroom. I suggested that it would be prudent for him to perhaps talk with his attorney before he speaks to me, although I did indicate that he could speak. Mr. Heuerman indicated to me that Mr. Harris, I guess in their most recent discussion, he characterized Mr. Harris as not wanting to hear what Mr. Heuerman had to say so, I guess there is a difference of opinion between Mr. Heuerman and Mr. Harris.

* * *

18

Okay. Mr. Heuerman, how do you want to proceed?

MR. HEUERMAN: Well, Mr. Harris is certainly insistent on wanting to have a little discussion with you, Judge, and while I am instinctively, I would say, hesitant to resist into the idea simply because I do represent him, uhm, I think, suspect we are in a position where, you know, I could either say go ahead or I could say; absolutely not. As long as I'm your attorney I won't allow that, Louis [the defendant]. In which case we may end up in another situation where he would choose not to want my representation at all any more.

In either event, I think that Louis is going to get to talk so I'm kind of at a loss so I won't stand in the way, especially since he did tell me what it was that he wanted to indicate to you and I don't think there is anything particularly dangerous in what he wants to say.

\* \* \*

THE COURT: All right. Well this is how I'm going to handle it. Mr. Harris, we are here today, you have an attorney, you asked for his representation, I appointed him to represent you. He has timely filed a motion to reconsider the sentence which is a, a prelude to either reconsidering the sentence or a subsequent appeal, which is certainly your right to do. In fact I've explained that to you.

But I intend to at least hear the arguments on the motion to reconsider before I, before I listen to what you want to say."

¶ 28        Attorney Heuerman went forward on the motion to reconsider sentence. Heuerman argued that defendant's sentence of 14 years in prison was excessive under the circumstances of

this case and asked the trial court to reconsider the weight that it gave to the various factors in aggravation and mitigation. The State opposed the motion to reconsider sentence.

¶ 29    After listening to the arguments of the attorneys, the trial court gave defendant an opportunity to speak. The following was stated:

"THE DEFENDANT: *** I want to address, uhm, that, uhm, I have a violation of, against the State violated one of my 5th Amendment law, constitutional right to double jeopardy, Your Honor.

I have a letter written out that I want the Court to make copies of, I want this letter entered into records that the State, the People of the State violated my constitutional right of double jeopardy protection law, protection clause. And I tried to talk to Mr. Heuerman about it, he, you know, so I want a motion, I wanted a verbal motion to dismiss this case because my, my, the 5th Amendment of my constitutional right was violate and no one addressed that by me being served twice for the same crime. I've been served, I got two charges which is, is the elements of, of the crimes, of two different crimes, of the same crime.

And so I wanted, I wanted to address that motion to dismiss this case, Your Honor, but I can't seem to get Mr. Heuerman to want to address that so I want to file, have this paper filed with the court's of the clerk, Your Honor, that, the violation of my 5th Amendment constitutional right been, been violated.

I would like for you to read it, Your Honor, if you, if you care, if you care.

THE COURT: Okay.

THE DEFENDANT: And Mr. Heuerman has been very ineffective in my behalf as assisting me as counselor. So I'm considering maybe another possible

20

attorney. I'm not sure yet at this time because I don't know whose, whose sides he is really on.

   ***

   In the beginning with the 2012, uhm, April the 3rd I was arrested and then April the 18th, Mr. Gary Spencer, State's Attorney Gary Spencer served me with two counts of the same hum, hum, charges. Count I, Unlawful Delivery of a Controlled Substance, Count II Unlawful Delivery of a Controlled Substance in front of St. Mary's School. So the only difference between the two is the amount of cocaine. One say 1.06 and the other say less than [a] gram with a sworn statement that Gary Spencer signed.

   So I think that's, that's the argumentable (phonetic) for the judge to, to, uhm, uhm, seek justice on my behalf.

   THE COURT: Anything else, sir?

   THE DEFENDANT: Uhm, no, Your Honor, not right now."

¶ 30   Defendant tendered to the trial court his written letter that he had prepared directing attorney Heuerman to file a motion to dismiss the charges on double jeopardy grounds. The letter was in the nature of a *pro se* motion to dismiss. Defendant stated in the letter, among other things, that he did not file a motion to dismiss at an earlier time because neither the trial court nor defendant's attorney advised defendant of his constitutional protection against double jeopardy. Defendant went on to state in the letter that he was denied effective assistance of counsel by the failure of the trial court and defendant's attorney to raise a double jeopardy claim. Upon inquiry by the trial court, attorney Heuerman confirmed that he was not adopting defendant's motion to

21

dismiss. The trial court found that the motion to dismiss was untimely and that it lacked merit. In so doing, the trial court stated:

> "First of all I find that the Motion to Dismiss the case is, is untimely filed. I will note parenthetically that Mr. Louis Harris, while representing, while represented in a pretrial capacity at one point in time chose to represent himself. And I admonished Mr. Harris time and time again prior to the case proceeding to trial that it simply was not prudent for him to proceed in his *pro se* capacity, and that he had the right to have legal counsel appointed.
>
> And let me talk about that legal counsel. I'm not making any, any determination as to whether or not Mr. Heuerman was effective, all I know is this; I have dealt with James Heuerman not only as public defender here recently but also in his capacity previously, years ago, as an Assistant State's Attorney, and even prior to that time as an attorney in private practice and have found his, his representation of his clients to be exemplary, professionally done, and always in the, in his client's best interest. And he has advocated in that regard countless times in front of me.
>
> And I certainly can understand why he would not have adopted this Motion to Dismiss because as I indicated previously it has not been timely filed. The motion, frankly, is, is as far as I'm concerned nonsensical. It has absolutely no basis in law, and I'm not even, in fact, in point of fact it is not timely filed so I'm not even going to make a ruling on it. I will make it part of the record so that the Appellate Court can see how Mr. Harris has chosen to proceed in this case, but it's, not only is it not timely filed it has absolutely no merit whatsoever."

22

¶ 31    After addressing defendant's *pro se* motion to dismiss, the trial court addressed further the motion to reconsider sentence that attorney Heuerman had filed on defendant's behalf. The trial court denied the motion to reconsider sentence and explained its reasons for doing so on the record. Defendant appealed.

¶ 32                                    II. ANALYSIS

¶ 33                                 A. Standby Counsel

¶ 34    As his first point of contention of appeal, defendant argues that the trial court erred in denying defendant's pretrial request for the appointment of new standby counsel after current standby counsel was allowed to withdraw. Defendant asserts that the trial court abused its discretion in making its ruling because the trial court failed to consider the *Gibson* factors (*People v. Gibson*, 136 Ill. 2d 362, 380 (1990)) and based its decision instead solely on the fact that defendant could read and write. Defendant asserts further that the *Gibson* factors favored the appointment of new standby counsel in this case because the charges against defendant were grave, there were significant legal complexities confronting defendant in presenting his defense, defendant had limited education and limited experience as a defense advocate, and because the justification for the trial court's denial of defendant's request was insufficient, since the trial court already knew defendant could read and write when the trial court appointed standby counsel initially. Defendant claims that he was prejudiced by the trial court's ruling in that he was unable to secure witnesses, introduce evidence, present his own testimony to rebut the State's allegations, conduct meaningful *voir dire*, or present an intelligible closing argument. Defendant asks, therefore, that we reverse the trial court's ruling and that we remand this case for a new trial.

¶ 35 The State argues first that defendant has forfeited this issue by failing to raise it in his posttrial motion in the trial court and by failing to argue for plain error review of this issue in his brief on appeal. Second, and in the alternative, the State argues that even if defendant had argued for plain error review, defendant's forfeiture of this issue should still be honored because the evidence is overwhelming that the trial court did not err in denying defendant's request for the appointment of new standby counsel. More specifically, the State asserts that the *Gibson* factors did not favor the appointment of new standby counsel in this case and that the trial court did not abuse its discretion in denying defendant's request. The State asks, therefore, that we find that defendant has forfeited this issue on appeal.

¶ 36 In reply, defendant argues that the forfeiture rule should be relaxed in the instant case because forfeiture is a limitation on the parties and not on the court and because justice requires that this issue be heard since defendant chose to proceed *pro se* knowing that he would have the assistance of standby counsel but was later denied that assistance by the trial court, an act that defendant compares to the complete denial of counsel during a critical stage of the proceedings (see *People v. Brzowski*, 2015 IL App (3d) 120376, ¶¶ 51-52 (finding that it was prejudicial to the defendant and an abuse of discretion for the trial court to excuse defendant's standby counsel prior to jury deliberations, a critical stage of defendant's trial, after the trial court had told defendant that he could represent himself with the assistance of a court-designated lawyer)). In the alternative, defendant argues that even if forfeiture potentially applies in this case, this court should review this issue under the second prong of the plain error doctrine. In making that argument, defendant notes that under the established law, a defendant may raise plain error in his reply brief on appeal. Defendant notes further that although our supreme court has compared second prong plain error to structural error, it has never limited second prong plain error review

to only those types of errors that have been classified as structural error. Assuming this court reviews the issue for second prong plain error, defendant maintains the same arguments he made initially as to why he believes that the trial court's ruling was erroneous.

¶ 37    The plain error doctrine is a very limited and narrow exception to the forfeiture or procedural default rule that allows a reviewing court to consider unpreserved error if either one of the following two circumstances is present: (1) a clear or obvious error occurred and the evidence in the case was so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error; or (2) a clear or obvious error occurred and the error was so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence. *People v. Sebby*, 2017 IL 119445, ¶ 48; *People v. Walker*, 232 Ill. 2d 113, 124 (2009); *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007); *People v. Herron*, 215 Ill. 2d 167, 177-87 (2005); Ill. S. Ct. R. 615(a) (eff. Jan. 1, 1967). Under either prong of the plain error doctrine, the burden of persuasion is on the defendant. *Walker*, 232 Ill. 2d at 124. If the defendant fails to satisfy that burden, the procedural default of the issue must be honored. *Id.* The first step in any plain error analysis is to determine whether an error occurred. *Id.* at 124-25. To do so, a reviewing court must conduct a substantive review of the issue. *Id.* at 125.

¶ 38    Under both the federal and state constitutions, a defendant has a right to represent himself in a criminal proceeding. *Gibson*, 136 Ill. 2d at 374-75. The right of self-representation, however, does not carry with it the right to legal assistance, and one who chooses to represent himself must be prepared to do so. *People v. Simpson*, 204 Ill. 2d 536, 562 (2001). Nevertheless, a trial court, in its discretion, may appoint standby counsel to assist a defendant who has elected to proceed *pro se*. See *Gibson*, 136 Ill. 2d at 375 (recognizing that the appointment of standby counsel to

25

assist a defendant who has chosen to proceed *pro se* does not offend the federal or state constitutional right of self-representation or any state statute or rule of court). The role of standby counsel is generally to assist the defendant in overcoming routine procedural or evidentiary obstacles to the completion of specific tasks, such as introducing evidence or objecting to testimony, and to help ensure the defendant complies with the basic rules of courtroom protocol and procedure. See *Simpson*, 204 Ill. 2d at 562. In determining whether to appoint standby counsel, the trial court should consider the following factors: (1) the nature and gravity of the charge, (2) the factual and legal complexity of the proceedings, and (3) the abilities and experience of the defendant. *Gibson*, 136 Ill. 2d at 380. The trial court has broad discretion to appoint standby counsel and to determine the extent and nature of standby counsel's involvement and its decisions in that regard will not be reversed on appeal absent an abuse of discretion. See *id.* at 375-79; *Simpson*, 204 Ill. 2d at 562-63.

¶ 39    After having reviewed the record in the present case and the *Gibson* factors, we find that the trial court did not abuse its discretion when it refused defendant's pretrial request to appoint new standby counsel after defendant's current standby counsel was allowed to withdraw. See *Gibson*, 136 Ill. 2d at 380; *Simpson*, 204 Ill. 2d at 562-63. Although the charge in this case was serious, the evidence in this case was not complicated. Defendant asserted an entrapment defense and did not challenge that he had sold the substance, that the substance contained cocaine, or that the sale took place within 1000 feet of a school. The jury trial on the charge was completed in a little over a day. Defendant was admonished several times about self-representation and each time elected to proceed *pro se*. Although defendant's representation of himself was far from perfect, he was adequately able to argue motions, conduct *voir dire*, examine witnesses, and make arguments to the jury and to the court. The trial judge acknowledged as much at sentencing

26

when he commented that defendant was able to argue his points coherently, to get his point across, and to clarify what he was trying to accomplish. Indeed, the record before us shows that defendant had no problem whatsoever communicating any concerns that he had to the trial court. Although defendant's closing argument at trial was somewhat inarticulate, defendant was able to communicate to the jury that he was claiming that he was entrapped and that he had been set up by the State and by the informant. In addition, the record shows that defendant had a lengthy and extensive criminal history and, thus, would have had extensive familiarity with the criminal justice system. Based upon the circumstances before us, we find that no error occurred in the trial court's denial of defendant's request for new standby counsel. See *Gibson*, 136 Ill. 2d at 380; *Simpson*, 204 Ill. 2d at 562-63. In reaching that conclusion we note that contrary to defendant's suggestion, the facts of this case are not comparable to the facts of *Brzowski*, where this court found that the trial court's act of excusing standby counsel before jury deliberations was prejudicial and an abuse of discretion because it deprived the defendant of the assistance of counsel at a crucial phase in his trial. See *Brzowski*, 2015 IL App (3d) 120376, ¶¶ 51-52. Having found that no error occurred, we further conclude that the plain error doctrine does not apply to excuse defendant's forfeiture of this particular alleged error. See *Walker*, 232 Ill. 2d at 124.

¶ 40                    B. Jury Instruction on Accomplice-Witness Testimony

¶ 41        As his second point of contention on appeal, defendant argues that he was denied a fair trial when the trial court failed to instruct the jury on accomplice-witness testimony pursuant to IPI Criminal No. 3.17 during defendant's jury trial. Defendant asserts that the instruction was required in this case because an accomplice witness, Curran, testified and implicated defendant and because the trial court assured defendant that the court and the prosecutor would review and tender instructions on defendant's behalf. Defendant acknowledges that he did not properly

27

preserve this issue for appellate review because he failed to tender the instruction in question at his jury trial but asserts that the forfeiture rule should be relaxed as to this issue because of the trial court's conduct in assuring defendant that the applicable jury instructions would be compiled for him. In the alternative, defendant asserts that this court should review this issue under the second prong of the plain error doctrine because the trial court's failure to give the jury the accomplice-witness instruction denied defendant his right to a fair trial by inhibiting the jury's ability to determine how much weight to give to Curran's testimony and impugned the integrity of the judicial process since the trial court took it upon itself to assist defendant with jury instructions but then did so deficiently. For those reasons, defendant asks that we find that this issue has not been forfeited (or that the forfeiture is excused), that we reverse defendant's conviction, and that we remand this case for a new trial.

¶ 42        The State does not specifically take a position on whether the trial court erred in failing to instruct the jury pursuant to IPI Criminal No. 3.17. Rather, the State merely asserts that this type of jury instruction error is not the type of error to which second prong plain error review applies. In making that assertion, the State maintains that our supreme court has limited second prong plain error review to structural error and error relating to the application of the one-act, one-crime doctrine. The State argues, therefore, that defendant has forfeited this issue on appeal and that defendant's forfeiture of this issue should not be excused.

¶ 43        As with the first issue, defendant again replies that our supreme court has not limited second prong plain error review to only claims of structural error. Defendant asks, therefore, that we review this issue for second prong plain error, that we find that error occurred, that we reverse defendant's conviction, and that we remand this case for a new trial.

28

¶ 44     It is well established that a defendant forfeits review of any alleged jury instruction error if the defendant does not object to the instruction or offer an alternative instruction at trial and does not raise the instruction issue in a posttrial motion. Ill. S. Ct. R. 615(a) (eff. Jan. 1, 1967); *Herron*, 215 Ill. 2d at 175. Defendant in the instant case did not offer the complained-of instruction at trial and did not raise the alleged error in his posttrial motion. Thus, this particular jury instruction issue has been forfeited. See Ill. S. Ct. R. 615(a) (eff. Jan. 1, 1967); *Herron*, 215 Ill. 2d at 175.

¶ 45     Defendant has argued that second prong plain error review should apply to this issue. As noted above, the first step in any plain error analysis is to determine whether an error occurred. *Walker*, 232 Ill. 2d at 124-25. IPI Criminal No. 3.17, titled "Testimony Of An Accomplice," provides as follows:

> "When a witness says he was involved in the commission of a crime with the defendant, the testimony of that witness is subject to suspicion and should be considered by you with caution. It should be carefully examined in light of the other evidence in the case."

The committee note following the instruction states that it is recommended that the instruction be given any time an accomplice testifies. IPI Criminal No. 3.17, Committee Note. The committee note indicates further that, under certain circumstances, a defendant is entitled to have the instruction given to the jury. *Id.* The committee note does not state, however, that the trial court must *sua sponte* give the instruction when an accomplice witness testifies, even though the defendant has not requested that the instruction be given. See *id.* Thus, we cannot conclude that the trial court's failure to give the instruction in this particular case constituted error. See *id.*

29

¶ 46    Even if we were to assume, for the sake of argument only and since the State has not taken a contrary position on appeal, that it was error for the trial court to fail to *sua sponte* give the jury the accomplice-witness instruction in this case, we would still have to reject defendant's plain error argument because we agree with the State that this is not the type of issue to which second prong plain error review applies. See *People v. Hopp*, 209 Ill. 2d 1, 12 (2004) (recognizing that the omission of a jury instruction constitutes second prong plain error only when the omission creates a serious risk that the jurors incorrectly convicted the defendant because they did not understand the applicable law so as to severely threaten the fairness of the trial). There is nothing in the record in this case to suggest that the jury failed to understand the applicable law or to indicate the existence of a serious risk that the jury convicted defendant because of a misunderstanding about the applicable law. See *id.* at 11-19. The jury was, after all, given IPI Criminal No. 1.02 and was specifically told in that instruction that it could consider any interest, bias, or prejudice a witness might have in determining whether to believe the witness and in determining how much weight to give to the witness's testimony. See *id.*

¶ 47    In rejecting defendant's plain error argument on this issue, we must acknowledge that there is some uncertainty in the law as to the type of issues to which second prong plain error review applies. Compare *People v. Eppinger*, 2013 IL 114121, ¶ 19 (indicating that to obtain relief under the second prong of the plain error doctrine, a defendant must show not only that a clear or obvious error occurred, but that the error was a structural error), with *People v. Clark*, 2016 IL 118845, ¶ 46 (indicating, although somewhat implicitly, that review under the second prong of the plain error doctrine is not restricted solely to the six types of structural error that have been recognized by the United States Supreme Court). Nevertheless, this particular issue is more in the nature of a typical trial error and is not the type of error that indicates that a

30

breakdown in the adversary process occurred. See *People v. Lewis*, 234 Ill. 2d 32, 47 (2009) (noting that plain error, which is marked by fundamental unfairness, occurs only in those situations where there has been a breakdown in the adversary process and not in those situations where there has merely been typical trial errors). We find, therefore, that second prong plain error review does not apply to this particular issue. See *id.*

¶ 48    Nor are we persuaded to relax the forfeiture rule here based upon the trial court's comment to defendant that the court would keep an eye out for any instructions that might benefit defendant. See *People v. Thompson*, 238 Ill. 2d 598, 612 (2010) (recognizing that the doctrine by which a reviewing court will relax the forfeiture rule where the alleged error involved the trial court's conduct will only be applied in extraordinary circumstances, such as when a judge makes inappropriate remarks to a jury or relies on social commentary instead of evidence in imposing a death sentence). This particular error does not involve "extraordinary circumstances." See *id.* Furthermore, defendant was thoroughly admonished several times in this case about self-representation and clearly understood that he was not being represented by the trial judge.

¶ 49                          C. Juror Note-Taking

¶ 50    As his third point of contention on appeal, defendant argues that he was denied a fair trial when the trial court refused to allow jurors to take notes during defendant's trial. Defendant acknowledges that he did not properly preserve this issue for appellate review, since he failed to raise the issue in his posttrial motion but asserts that the forfeiture rule should be relaxed as to this issue because the alleged error involves the conduct of the trial court. If this court agrees that the forfeiture rule should be relaxed, then, according to defendant, the burden is on the State to show that the error was harmless beyond a reasonable doubt. Defendant maintains that the State

cannot meet that burden in this case where the note-taking ban was especially prejudicial to defendant because it prevented the jurors from keeping track of the evidence on each element of the offense necessary for the State to meet its burden of proof. Defendant asks, therefore, that we reverse his conviction and that we remand this case for a new trial.

¶ 51    As with the previous issue, the State does not specifically take a position in its appellate brief on whether the trial court erred by refusing to allow the jurors to take notes during defendant's trial.[2] Rather, the State merely asserts that the forfeiture rule should not be relaxed in this case and that defendant has failed to show that either first or second prong plain error has occurred. The State argues, therefore, that defendant has forfeited this issue and that defendant's forfeiture of the issue should not be excused on appeal.

¶ 52    The legal principles that apply to plain error review have been set forth above and will not be stated in full again here. As we noted above, the first step in plain error review is to determine whether error occurred. See *Walker*, 232 Ill. 2d at 124-25. There can be no dispute as to that here. The trial court was required by statute to allow the jurors to take notes and that requirement was mandatory. See 725 ILCS 5/115-4(n) (West 2014); Illinois Pattern Jury Instructions, Criminal, No. 1.05 (approved July 18, 2014) (hereinafter IPI Criminal No. 1.05); *People v. Johnson*, 2018 IL App (3d) 150352, ¶ 39; *People v. Strong*, 274 Ill. App. 3d 130, 135-37 (1995). Thus, the trial court erred in refusing to allow the jurors to take notes. See 725 ILCS 5/115-4(n) (West 2014); IPI Criminal No. 1.05; *Johnson*, 2018 IL App (3d) 150352, ¶ 39; *Strong*, 274 Ill. App. 3d at 135-37. That being said, however, we again agree with the State that this is not the type of error that is covered by second prong plain error review. See *Lewis*, 234 Ill.

---

[2] In oral argument, the State acknowledged that the trial court's refusal to allow the jurors to take notes was probably error.

2d at 47. We find, therefore, that defendant has forfeited this issue. See *People v. Layhew*, 139 Ill. 2d 476, 492-93 (1990) (finding that the defendant forfeited the issue of the trial court's refusal to allow juror note-taking where the defendant did not raise the issue in the trial court and failed to make any argument on appeal as to why the procedural default rule should not apply).

¶ 53  We note, however, that even if we had relaxed the forfeiture rule because the conduct of the trial court was at the center of this particular error, we would have still rejected defendant's claim because any error that occurred was harmless since the evidence of defendant's guilt in this case was overwhelming. See *Strong*, 274 Ill. App. 3d at 137 (finding that the trial court erred in prohibiting jurors from taking notes but that the error was harmless in light of the overwhelming evidence of the defendant's guilt).

¶ 54                                     D. *Krankel* Inquiry

¶ 55  As his final point of contention on appeal, defendant argues that this case should be remanded for the trial court to conduct a proper preliminary *Krankel* inquiry (*People v. Krankel*, 102 Ill. 2d 181, 182-89 (1984)) into defendant's *pro se* posttrial claim of ineffective assistance of counsel. More specifically, defendant asserts that his *pro se* posttrial complaint to the trial court about his attorney was sufficient to trigger the trial court's obligation to conduct a *Krankel* inquiry; that the trial court failed to conduct that inquiry; and that the trial court instead ignored defendant's complaint, stating that defense counsel had always provided competent representation in past cases. Defendant asks, therefore, that we remand this case for the trial court to conduct a proper preliminary *Krankel* inquiry into defendant's *pro se* posttrial claim of ineffective assistance of counsel.

¶ 56  The State argues that the trial court already conducted a *Krankel*-type inquiry, allowed defendant to state his concerns, and implicitly found that there was no merit to defendant's

33

*pro se* posttrial claim of ineffective assistance of counsel. The State argues, therefore, that we should reject defendant's request for a remand and affirm defendant's conviction and sentence.

¶ 57    When a defendant files a *pro se* posttrial motion alleging ineffective assistance of counsel, the trial court must conduct an adequate inquiry into the factual basis of the defendant's claim. See *People v. Moore*, 207 Ill. 2d 68, 77-78 (2003). The trial court may conduct its inquiry in one or more of the following ways: (1) by questioning the defendant's attorney about the facts and circumstances surrounding the allegations, (2) by questioning the defendant, and (3) by relying on its own knowledge of the counsel's performance in the proceeding. See *id.* at 78-79. If the trial court determines from its inquiry that defendant's claim lacks merit or that it raises only matters of trial strategy, the trial court need not appoint new counsel and may deny the *pro se* motion. *Id.* at 78. If, on the other hand, the trial court determines from its inquiry that the allegations show possible neglect of the case, new counsel should be appointed to represent defendant further on the motion. *Id.* To trigger the trial court's obligation to conduct the above inquiry, a *pro se* defendant needs only to bring his claim to the attention of the trial court. *Id.* at 79. The question of whether the trial court made an adequate inquiry into a *pro se* posttrial claim of ineffective assistance of counsel is a question of law that is subject to *de novo* review on appeal. *People v. Jolly*, 2014 IL 117142, ¶ 28.

¶ 58    In the present case, after having reviewed the record, we find that the trial court sufficiently inquired into defendant *pro se* posttrial claim on ineffective assistance of counsel. Defendant clearly explained to the trial court both orally and in his written motion (the letter) the conduct of posttrial counsel that defendant was complaining about—the failure or refusal of posttrial counsel to file a motion to dismiss the charge, of which defendant had already been tried and convicted, based upon double jeopardy grounds. The trial court gave defendant an

34

opportunity to express his concerns and made sure that defendant had stated everything that he had wanted to state on the record. The trial judge found defendant's *pro se* motion to dismiss— the one at the heart of defendant's claim of ineffective assistance of counsel—to be untimely and to be completely without merit and did not fault posttrial counsel for refusing to adopt defendant's motion. Based upon the record before us, we conclude that the trial court did everything that it was required to do under the law in addressing defendant's *pro se* posttrial claim of ineffective assistance of counsel. See *Moore*, 207 Ill. 2d at 78-79. Although it was improper for the trial court to consider the conduct of posttrial counsel in other cases, any error that occurred as a result thereof was harmless beyond a reasonable doubt because the trial court clearly and correctly determined that the basis of defendant's ineffective assistance claim (posttrial counsel's failure or refusal to file the underlying motion to dismiss) lacked any merit whatsoever. See *id.* at 80 (recognizing that the appellate court may affirm the trial court's ruling, even though the trial court erred in the manner it conducted the *Krankel* hearing, if the trial court's error was harmless beyond a reasonable doubt). Therefore, a remand for a *Krankel* hearing is not required in this case. See *id.* at 77-79.

¶ 59                                    III. CONCLUSION

¶ 60        For the foregoing reasons, we affirm the judgment of the circuit court of Whiteside County.

¶ 61        Affirmed.

¶ 62        JUSTICE McDADE, dissenting:

¶ 63        The majority has affirmed the conviction and 14-year sentence of Louis Harris for unlawful delivery of a controlled substance within 1000 feet of a school. In so doing, the majority has validated the trial court's denial of Harris's pretrial request for reappointment of

35

standby counsel, validated the trial court's failure to give an accomplice-witness instruction, found the trial court's refusal to allow the jurors to take notes to be harmless error, and found that remand for a *Krankel* hearing is unnecessary. I have no disagreement with the majority's statement of the facts or representation of the applicable law. Adopting both, I agree with the finding concerning the *Krankel* hearing and concur in that part of the majority decision. I disagree with the majority's other three findings and, therefore, respectfully dissent from them.

¶ 64       I begin by acknowledging and applauding the patience and persistence of the trial court's efforts to deter Harris from the folly of representing himself in his criminal jury trial. I believe those efforts demonstrate the court's recognition of the seriousness of the charges Harris was facing and the myriad ways in which a person without legal training could be confounded in attempting to defend himself, particularly in a case tried to a jury. Despite the court's diligence, Harris insisted on proceeding *pro se* and presented several significant challenges to the system. In this appeal, Harris contends that the court's resolution of some of those challenges constituted error.

¶ 65                                    Denial of Standby Counsel

¶ 66       Harris's first claim of error is the trial court's refusal to *re*appoint standby counsel after public defender, Elwin Neal, was allowed to withdraw as initial standby. Before considering the merits of this claim, I disagree with the parties and the majority that this issue has not been preserved and must be reviewed as plain error. After the jury had returned its verdict, Harris sought and was granted representation by the public defender for posttrial proceedings. While counsel's original posttrial motion was silent on the issue of representation, the amended motion seeking a new trial asserted error in the allowance by the trial court of Harris's *pro se* representation in the light of his unfitness to mount a meaningful defense. I would argue that the

36

refusal to appoint standby counsel is a "lesser included" issue of the broader claim raised by counsel; that is, if Harris is incapable of mounting a meaningful defense without legal representation, his incapacity would cover both representation by appointed counsel and, in the face of his irrational insistence on proceeding *pro se*, the assistance of standby counsel. With such assistance, Harris could at least avoid the pitfalls and distractions resulting from the plethora of procedural flaws that occurred in his attempts to defend himself. I would find the challenge regarding standby counsel to be implicit in the broader challenge that *was* articulated by counsel. I confess that I have found no rule or precedent supporting this specific interpretation. I do, however, believe it finds strong support in our supreme court's continuing commitment to providing meaningful access to justice—a commitment that surely encompasses much more than merely assuring admission to the *halls* of justice.

¶ 67        Ours is an adversarial system of justice that relies for the finding of truth upon the presentation of facts and contentions by the opposing parties and resolution of disputes and findings of fact by the court or a jury acting as the ultimate impartial determiner of truth. That process cannot play out as anticipated and needed if there is a gross imbalance in the presentation of the positions of the parties. Such an imbalance affects the reliability of credibility assessments, the trustworthiness of verdicts and, necessarily, the integrity of the courts. For these reasons, I would find the issue has been preserved and plain-error review is unnecessary.

¶ 68        However, even if plain-error review were required, I would find error in the form of abuse of the trial court's discretion in denying Harris's second request for standby counsel and plain error in the resultant undermining of systemic integrity.

¶ 69 The decision of whether to appoint standby counsel rests in the discretion of the trial court (*People v. Gibson*, 136 Ill. 2d 362, 379 (1990)), but the exercise of that discretion is not unfettered. The *Gibson* court stated:

> "Relevant criteria appropriately considered by a trial court in deciding whether to appoint standby counsel to assist a *pro se* defendant in a criminal case include the nature and gravity of the charge, the expected factual and legal complexity of the proceedings, and the abilities and experience of the defendant." *Id.* at 380.

¶ 70 The sole expressed basis for the trial court's denial of such assistance to Harris was his ability to read and write. Not a single one of the factors mentioned in *Gibson* is informed by, or even implicated in, a conclusion that a defendant can read and write. Your average third grader could meet that standard; it is an extremely low bar and speaks not at all to the effectiveness of the adversarial process or the integrity of our judicial system. That fact, standing alone, should be sufficient to support a finding that the trial court abused its discretion and to require the reversal of Harris's conviction and a new trial.

¶ 71 Beyond that, however, I believe, contrary to the decision of the majority, that the factors mentioned in *Gibson* are implicated by Harris's situation and a reversal is required on that basis as well. Looking at the first factor, Harris was charged with a Class X offense. Conviction would subject him to a sentencing range of between 6 and 30 years and a fine of up to half a million dollars. He was, in fact, sentenced to 14 years in the DOC. Moreover, the court not only specifically told him that the charge was extremely serious, I believe the judge's persistent attempts to dissuade Harris from representing himself reflected his recognition of its gravity. Clearly, the first factor favored appointment of standby counsel. See *id.*

38

¶ 72    The second factor directs the court to consider the expected factual and legal complexity of the proceedings. *Id.* Unlike the majority, I do not believe the proceedings lacked significant complexity. Having chosen to represent himself, Harris had to participate in complex pretrial motion practice, fielding, *inter alia*, motions *in limine* relating to the admissibility of prior criminal actions; develop a defense strategy that presented his position in the best possible light to the jury; question the State's lay and expert witnesses in a way that benefited that strategy, and persuade the jury of his innocence. And in fact, he fell woefully short of dealing effectively with the actual complexity that confronted him in his self-representation. His *voir dire* of potential jurors was an absurd exercise in irrelevance in which he sought to learn if they knew the identity of God, the Holy Spirit, and Lucifer; if they believed in God; and if they knew what they had to do to be saved. Further, in his questioning of the State's witnesses Harris elicited testimony that inculpated him not only in the crime with which he was charged but also in prior similar criminal activity. His posttrial conversation with the trial judge revealed that he had no understanding of the double jeopardy he was trying to invoke. Of greater significance and concern, that conversation suggested that he had not fully understood the charges laid against him because he demonstrated no grasp of alternative pleading.

¶ 73    One is sorely tempted to say "So what!? He was warned countless times about the risks and pitfalls of representing himself and he still insisted on doing so. He caused his own problems." And that would be true; he did. And arguably he deserved the outcome he got. It is very hard to generate much sympathy for someone who so stubbornly and doggedly insists on shooting himself in the foot. But that still leaves open the issue of the integrity of the judicial system. With the appointment and assistance of standby counsel, Harris could have at least complied with fundamental procedural rules and presented his chosen defense more effectively

39

to the jury. Absent the gross procedural missteps, the jury might have been less distracted by the farce being played out before it and better able to focus on the theory he was presenting. The playing field still would not have been level, but it would have been less tilted against his interest and that of our system of justice in a fair trial.

¶ 74  Turning finally to the third factor—the abilities and experience of the accused—the majority finds that Harris was sufficiently able and experienced that it was satisfied. This conclusion is based on (1) the trial court's assessment that Harris was respectful and could speak articulately (and, presumably, that he could read and write) and (2) the fact that he "had a lengthy and extensive criminal history and, thus, would have had extensive familiarity with the criminal justice system." It is not at all clear to me how being an experienced and prolific criminal and a defendant with significant experience being represented by trained counsel can create an advocate even moderately capable of defending himself before a jury.

¶ 75  Again, I acknowledge that Harris was warned repeatedly against representing himself and he proceeded down that path deliberately and to his own detriment. Nonetheless, a fair and objective consideration of the concerns identified in *Gibson* should compel the dual conclusions that standby counsel *should* have been appointed and that the trial court abused its discretion when, on the sole basis that Harris could read and write and without giving even cursory attention to those factors, it refused his request for that assistance. For these reasons, I would find that the court's denial of standby counsel constitutes error that undermines the integrity of the judicial system—second-prong plain error—and creates a presumption of prejudice, requiring reversal of Harris's conviction.

¶ 76  Because I would reverse on the foregoing issue, my discussion of the other two findings from which I dissent will be very brief.

¶ 78        Harris argues that the trial court erred when it failed to give the jury Illinois Pattern Jury

Instructions, Criminal, No. 3.17 (approved Oct. 17, 2014) (hereinafter IPI Criminal No. 3.17),

which would have instructed the jury to treat the testimony of Curran, as a possible accomplice,

with caution. Harris did not preserve this issue for review, requiring plain-error review. The State

argues that Harris cannot meet either prong of a plain-error analysis and, therefore, the issue is

forfeited.

¶ 79        Both prongs require an initial finding that an error on the part of the trial court occurred.

Since Harris did not tender the instruction for the court to accept or reject, it initially appears that

the only error relevant to this issue was his. But here, although he clearly had no duty to do so,

the trial judge volunteered to consider jury instructions in conjunction with the prosecutor and to

include those that were applicable to Harris's defense in his charge to the jury. Thus, the court

effectively relieved Harris of the obligation to learn about the relevant jury instructions and to

select and tender the ones he wanted given and assumed that responsibility for him. The court

did not give the accomplice witness instruction to the jury, and this claim in the appeal requires

us to consider whether it erred in failing to do so.

¶ 80        The purpose of jury instructions is to provide the jurors with the legal principles they

should properly apply to the evidence so that the jury may reach a correct conclusion according

to the law and the evidence. *People v. Hale*, 2012 IL App (4th) 100949, ¶ 19. The accomplice-

witness instruction at issue here should be given to a jury if the totality of the evidence and the

reasonable inferences that can be drawn from the evidence establish probable cause to believe

not merely that the person was present and failed to disapprove of the crime but that he

participated in the planning and/or commission of the crime; if probable cause is established, the

41

instruction should be given despite the witness's protestations that he did not so participate. *People v. Kirchner*, 194 Ill. 2d 502, 541 (2000).

¶ 81    Here the State did not affirmatively claim that Curran participated in the planning or commission of the crime, and the majority has found there was no need to instruct the jury on IPI Criminal No. 3.17. I do not agree. Curran was not merely present at the residence. She testified that she was present in the room as the transaction took place. She did *not* testify that she was shocked, dismayed, or upset when it occurred in her residence and her presence or that she made any effort to stop it. Moreover, she testified that the drug transaction at issue in this case resulted in her being charged by the State and convicted of unlawful use of a building—a charge which implies a measure of complicity for allowing the drug transaction to occur in her apartment. She also acknowledged having been convicted of unlawful delivery of a controlled substance but claimed to be unsure if it was in conjunction with the current case or was an earlier conviction. It appears to have been related to this transaction. This testimony was sufficient to support a reasonable inference that Curran knowingly contributed the premises in furtherance of the drug sale and was a party to it and to trigger an instruction to the jury on the wariness with which they should consider accomplice-witness testimony. I would find that the court's failure to provide that instruction in these circumstances was not only error but constituted plain error.

¶ 82    An omitted jury instruction constitutes plain error only when the omission creates a serious risk that the jurors incorrectly convicted the defendant because they did not understand the applicable law and that lack of understanding severely threatens the fairness of trial. *Hale*, 2012 IL App (4th) 100949, ¶ 22. This rule does not require that defendant prove beyond doubt that his trial *was* unfair because the omitted instruction misled the jury to convict him. *Id.* It does require that he show that the error caused a severe threat to the fairness of his trial. *Id.* Illinois

42

Supreme Court Rule 451(c) (eff. Apr. 8, 2013) states: "instructions in criminal cases shall be tendered, settled, and given in accordance with section 2-1107 of the Code of Civil Procedure, but substantial defects are not waived by failure to make timely objections thereto if the interests of justice require."

¶ 83        In this case, Curran provided the only corroboration of the confidential informant's testimony that the drug transaction occurred. As pointed out by Harris in his initial brief, without her testimony there was "no evidence corroborating the confidential informant's testimony since the surveillance footage did not show the drug transaction." An assessment of her credibility was, therefore, critical to the jury's determination of what actually happened and whether there was anything that occurred that could support or refute Harris's defense that he had been entrapped. For this reason, the omission of the accomplice-witness instruction severely threatened the fairness of Harris's trial. See *People v. Campbell*, 275 Ill. App. 3d 993, 999 (1995) ("Had the accomplice-witness instruction been given, the jury would have been compelled to examine the testimony of [the witnesses] in that light, which would have militated in favor of giving serious consideration to defendant's explanation of the event."). Moreover, there can be no credible argument that the error was harmless because there is no way to know how the jurors would have judged Curran's testimony when viewing it with the requisite jaundiced eye. See *People v. Glasco*, 256 Ill. App. 3d 714, 719 (1993) ("It is crucial that juries understand that the law requires the trier of fact to give special scrutiny to the testimony of accomplices. The importance of this instruction concerning the unreliability of accomplice testimony has been shown by cases which have held it to be reversible error not to give the instruction to the jury.").

43

¶ 84    I would find, based on this analysis, that the trial court's error, standing alone or viewed in conjunction with the refusal to appoint standby counsel, threatened the fairness of Harris's trial, constituted plain error, and now requires reversal of his conviction.

¶ 85                     Refusal to Allow Jurors to Take Notes

¶ 86    Harris's third claim of error relates to the trial court's prohibition of notetaking by the jurors during trial in violation of section 115-4(n) of the Code of Criminal Procedure of 1963 (725 ILCS 5/115-4(n) (West 2016)). As with the prior issue, this claim of error was not preserved and must be reviewed as plain error.

¶ 87    Section 115-4(n) states:

> "The members of the jury shall be entitled to take notes during the trial, and the sheriff of the county in which the jury is sitting shall provide them with writing materials for this purpose. Such notes shall remain confidential, and shall be destroyed by the sheriff after the verdict has been returned or a mistrial declared."
> *Id.*

In prohibiting the jurors from taking notes during the trial, the trial court violated this law and committed error. *People v. Johnson*, 2018 IL App (3d) 150352, ¶ 39 ("It is a measure to protect defendants' constitutional rights to fair trials. It is also the jurors' right."); *People v. Strong*, 274 Ill. App. 3d 130 (1995). The question then becomes whether that error rises to the level of plain error. The majority has found that it does not; I do not agree.

¶ 88    When viewed in the totality of the circumstances of this case, the error in refusing to allow the jurors to take notes is not harmless. As previously discussed, Harris had been denied the assistance of standby counsel at his trial. The trial transcript documents a plethora of missteps and errors by Harris in his fumbling attempts to present his defense to the jury. If he was able to

44

make any points that advanced his cause and that were caught by the jury, they were very likely to have been forgotten in the flurry of objections by the prosecutor and the judge's warnings to Harris and admonitions to the jury. In his opening brief, Harris provides a compelling description of just one of the several impossibilities faced by jurors hampered by their inability to take notes:

> "Further, having no notes to reflect back on, the jurors were forced to decipher the defendant's theory of the case based on their recollection of Harris' disjointed cross-examinations. For instance, in Harris' cross-examination of Curran, jurors were unable to take notes concerning the dates and occurrence of certain events—notably both the court and the State were confused as to the timing of the events [citation]. Thereafter, the court admonished the jury not to consider any of Harris' statements, only his questions and the witness' answers [citation]. However, the State was objecting so frequently to Harris' statements during questioning that it would have been nearly impossible to remember which statements the jury could consider and which it was admonished to forget [citations] [record of the State's objection frequency and the court's requests for the defendant to ask questions]."

¶ 89      As shown in just this one example from what is hopefully an aberrant but clearly meaningless and absurd exercise in criminal justice, the inability to keep a tangible record of the proceedings would leave confused jurors with no option but to find the defendant guilty of the crimes with which he had been charged. They would be justified in doing so because the only coherent, mentally trackable and retainable presentation had been made by the State.

¶ 90      It seems painfully obvious to me that no coherent defense strategy was developed or advanced here, that no balanced adversarial testing occurred here, and that there was no semblance of a fair trial here. The fact that it was primarily Harris's own short-sighted

45

obstinance that created the situation initially does not, in my opinion, excuse the failure of the trial court to make decisions reasonable and necessary to mitigate the disastrous consequences and ensure some measure of systemic integrity.

**No. 3-16-0169**

| | |
|---|---|
| **Cite as:** | *People v. Harris*, 2020 IL App (3d) 160169 |
| **Decision Under Review:** | Appeal from the Circuit Court of Whiteside County, No. 12-CF-138; the Hon. John L. Hauptman, Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Peter A. Carusona, and Amber Hopkins-Reed, of State Appellate Defender's Office, of Ottawa, for appellant. |
| **Attorneys for Appellee:** | Terry A. Costello, State's Attorney, of Morrison (Patrick Delfino, David J. Robinson, and Richard T. Leonard, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |

47