2022 IL App (2d) 210260-U
No. 2-21-0260
Order filed May 11, 2022

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(l).

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Winnebago County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 18-CF-3004 |
| SANCHEZ AKEEM CURRY, | ) ) ) | Honorable Joseph G. McGraw, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE ZENOFF delivered the judgment of the court.
Justices Jorgensen and Brennan concurred in the judgment.

**ORDER**

¶ 1   *Held*: Defendant's conviction of first-degree murder was affirmed where (1) the evidence was sufficient to sustain the conviction, (2) the record on appeal was incomplete with respect to defendant's contention that he and his codefendant should have been tried separately, and (3) the trial court did not abuse its discretion by denying defendant's request for standby counsel. The trial court also did not abuse its discretion by imposing a sentence of life in prison.

¶ 2   Defendant, Sanchez Akeem Curry, was convicted of first-degree murder (720 ILCS 5/9-1(a)(1) (West 2018)) following a jury trial at which he represented himself. The jury also found that defendant personally discharged a firearm that proximately caused the death of the victim, Anton Harris. The court sentenced defendant to life in prison. Defendant appeals. We affirm.

¶ 3                                I. BACKGROUND

¶ 4                               A. Pretrial Matters

¶ 5     Defendant and his codefendant, Devontae Wrancher, were charged with first-degree murder and other offenses in connection with the death of Harris.[1] Defendant was initially represented by an assistant public defender. Wrancher was represented by private counsel.

¶ 6     Through counsel, defendant moved to sever his and Wrancher's trials. An order dated April 10, 2019, indicates that the court denied that motion after hearing argument and evidence. The record on appeal does not contain a transcript of the hearing on the motion to sever.

¶ 7     The matter was set for trial. Defendant's counsel moved to continue the trial because she was scheduled to undergo surgery. At the next court date, defendant informed the court that he wished to proceed *pro se*. The court gave defendant the proper admonishments then asked him whether he still wished to proceed *pro se*. Defendant responded by requesting standby counsel. The court denied that request, reasoning *inter alia* that (1) standby counsel was "a role that is incapable of being defined," as it could mean different things in different cases, and (2) appointing standby counsel would engender confusion as to which decisions were made by defendant versus his attorney. Though the court recognized that it might be "permitted" in certain circumstances to

---

[1] The State filed a 23-count indictment against defendant. Counts 1 through 12 alleged first-degree murder under alternative theories. Counts 13 through 20 alleged felony murder predicated on mob action. Counts 21 and 22 alleged mob action. Count 23 alleged unlawful possession of a weapon by a felon. The court severed count 23 for purposes of trial. During trial, the court dismissed counts 13 through 22. The jury found defendant guilty of 12 counts of first-degree murder, and the trial court determined that all counts merged into count 4.

appoint standby counsel, the court said that it had "in [its] experience avoided" doing so.

¶ 8    Defendant then reiterated his request for standby counsel, narrowing his request to pretrial assistance with "filing motions and also subpoenaing evidence and documents and witnesses." Defendant explained that he wanted assistance of counsel in connection with "the technical aspects" of pretrial procedure, though he was confident in his ability to conduct the trial himself. Defendant assured the court that his standby counsel would "not even have to be present during trial." The court denied defendant's narrowed request for standby counsel, emphasizing the difficulty to a lawyer of having to help defendant with pretrial matters without knowing defendant's whole trial strategy. In light of the court's ruling, defendant reaffirmed his desire to proceed *pro se*, and the court allowed defendant to do so.

¶ 9                                    B. The Trial

¶ 10    Defendant was tried jointly with Wrancher. The State's theory was that, around 8 p.m. on September 23, 2018, defendant and Wrancher lured Harris to an apartment complex in Rockford to kill him. According to the State, as Wrancher spoke with Harris in the parking lot of the apartment complex, defendant shot Harris twice, killing him. Wrancher admittedly was present when Harris was shot, but Wrancher's defense was that he did not know the identity of the shooter or that a shooting was going to occur. Defendant's theory was that the State failed to prove that he was present at the scene or that he participated in the shooting.

¶ 11                                1. The State's Case

¶ 12                                a. *Deneshia Epps*

¶ 13    Deneshia Epps, who was Harris's girlfriend, was an eyewitness to the murder. She testified that, on September 23, 2018, she drove from Chicago toward Freeport with her young son and Harris. As Epps was driving, Harris spoke with Wrancher via Snapchat. Epps did not personally

know Wrancher. Harris wanted to stop at an apartment complex in Rockford to meet with Wrancher. Epps was vague in describing the purpose of this meeting, testifying only that Harris wanted to "pick up a bank card" from Wrancher or that the meeting was about "credit cards." Neither Epps nor Harris was familiar with this area of Rockford, and they initially were unable to locate the meet-up spot. Epps and Harris drove to a gas station, and Harris moved to the driver's seat. Harris and Epps eventually located Wrancher in the parking lot of an apartment complex.

¶ 14    Epps testified that she remained in the passenger's seat of the car while Harris got out and spoke to Wrancher. Harris and Wrancher spoke but did not yell at each other. Epps then saw a person wearing a white shirt walk toward Harris, pull out a gun, and fire two gunshots. Epps did not think that the first gunshot hit Harris, as she saw him run in front of her car before the second shot. Epps testified that some sort of "tussle" ensued between Harris and the shooter, though she could not say exactly when it occurred during the shooting, as it "all happened so fast." According to Epps, Wrancher "stood there" while all this was happening; Wrancher did not put his hands up. Epps then moved to the driver's seat of the car, drove away from the scene, and called 911.

¶ 15    Epps was unable to describe the shooter, other than to say that he was wearing a white shirt and that he was a little taller than Harris. It was Epps's impression from what she witnessed that Wrancher and the shooter "were together" (*i.e.*—that Wrancher knew the shooter).

¶ 16                              b. *The Police Response and Harris's Death*

¶ 17    Epps's 911 call came in at 7:57 p.m. Officers arrived at the scene of the shooting within minutes. Both Wrancher and the shooter were gone by that point. The officers focused on assisting Harris, who was alive but unresponsive. Harris was taken to the hospital, where he died.

¶ 18    The forensic pathologist who performed the autopsy, Dr. Mark Peters, determined that Harris died of a gunshot wound to his back that pierced his right lung. Harris also suffered a second

grazing gunshot wound to his forearm. At the scene of the shooting, police officers located two .45 caliber shell casings and a bullet fragment. The stamp on the casings said: "Federal 45 Auto + P."

¶ 19                                 c. *Wrancher's Statements to Police*

¶ 20    In the days following the shooting, police officers focused their attention on Wrancher as a suspect. On September 25, 2018, Detective Heath Engelkens of the Winnebago County Sherriff's Department interviewed Wrancher. At the beginning of trial, the parties discussed the following limiting instruction in connection with Engelkens's testimony:[2]

> "Evidence has been received that the defendants have been involved in conduct other than that charged in the indictment. This evidence has been received on the issue of the defendants' relationship, identification, and motive and may be considered by you only for *** those limited purposes. It is for you to determine whether the defendants were involved in that conduct and, if so, what weight should be given to this evidence on the issue of relationship, identification, [and] motive."

The court asked defendant whether he was requesting the court to read this instruction to the jury at the conclusion of Engelkens's testimony. Defendant responded in the affirmative. In accordance with defendant's request, the court ultimately gave a substantially similar limiting instruction to the jury. At the conclusion of trial, the court also informed the jury that "[t]he statement made by the defendant—by one defendant may not be considered by you against any other defendant."

---

[2] The record on appeal does not contain copies of either the tendered or approved jury instructions. The record does, however, contain trial transcripts that include discussions regarding jury instructions and the court's oral instructions to the jury.

¶ 21 Without objection from defendant, Engelkens testified to the substance of Wrancher's police interview. According to Engelkens, Wrancher told him the following. On September 23, 2018, Wrancher was going to meet with "a guy" from Chicago whom he knew as "Turnip." Wrancher and Turnip communicated through Snapchat. The purpose of their meeting was to "crack cards." (From Engelkens's brief description of what it means to "crack cards," it seems that Wrancher and Turnip intended to split money derived from illicitly using third parties' credit or debit cards.) Wrancher and Turnip had met on two prior occasions to "exchange cards." The first time that they met up, they exchanged cards but "things didn't work out, the money didn't work."

¶ 22 Wrancher told Engelkens that he set up a meeting with Turnip on September 23, 2018, at an apartment complex in Rockford. Turnip was accompanied to the meeting by a female who Wrancher did not recognize. Turnip got out of the car and spoke to Wrancher for two to three minutes. Then, according to Wrancher, an unknown black male with long hair, a beard, and a white shirt came up to them and said: " 'Give me everything.' " Wrancher froze, put his hands up, ran, and heard shots.

¶ 23 Engelkens testified that Wrancher provided consent to search both his cell phone and his Snapchat account. Wrancher tendered to the police an iPhone for these purposes. The signed consent-to-search form indicates that the phone number for this device was 312-483-****. Police officers determined that Wrancher's Snapchat account had been deactivated and that the Snapchat application had been deleted from this cell phone.

¶ 24 d. *The Extraction of Data from Wrancher's Phone*

¶ 25 Detective Bob Juanez of the Winnebago County Sheriff's Department extracted call-information data from the cell phone that Wrancher provided. The name of this device was "Jacquala's iPhone." There were two separate email accounts registered to this phone: one for

Wrancher and one for somebody named Jacquala.

¶ 26    Juanez testified that what drew his attention was that this phone communicated heavily with phone number (815) 975-**** before and after the shooting. Specifically, these two phone numbers were in contact 14 times on September 23, 2018, before Epps's 911 call came in at 7:57 p.m., and they were in contact 6 more times afterward on that day. The last call between these phone numbers before 7:57 p.m. was at 7:33 p.m., and this call lasted 5 minutes and 10 seconds. The first call after the 911 call was at 8:03 p.m., and this call lasted 2 minutes and 41 seconds.

¶ 27    Jacquala Roberson testified that she was friends with Wrancher and that she once dated him. She testified that she provided Wrancher with an iPhone to use. Although she did not know what number was associated with "Jacquala's iPhone," she said that it was "an out-of-town number," not a "Rockford number." Roberson also said that Wrancher was known to call her from "all kinds of numbers."

¶ 28    Shane Ernst, who was initially referred to at trial as a "caseworker" to avoid disclosing to the jury that defendant was on parole when the shooting occurred, testified that defendant's phone number was (815) 975-****. AT&T records likewise identified defendant as the subscriber associated with this prepaid phone number.

¶ 29    On October 2, 2018, police officers located the phone associated with phone number (815) 975-**** in Wrancher's possession at a bar in Rockford.

¶ 30                    e. *The Search of Defendant's Home*

¶ 31    On October 2, 2018, police officers executed a search warrant at defendant's home on Edgewood Road in Machesney Park. The evidence showed that defendant resided at this home with family. Officers recovered a credit card reader, an empty case for a .45 caliber pistol, and a box of .45 caliber ammunition. The stamp on the ammunition said: "Federal 45 Auto + P." Police

officers also located a phone somewhere inside defendant's residence. On that phone, defendant's contact information was associated with a phone number other than (815) 975-****.

¶ 32                                    f. *Historical Cell Site Analysis*

¶ 33    Special Agent Joseph Raschke of the Federal Bureau of Investigation analyzed the activity associated with phone number (815) 975-****. Without objection, the court accepted Raschke as an expert on the topic of historical cell site analysis. Raschke opined that, between 7 and 8 p.m. on September 23, 2018, the phone activity was consistent with this phone traveling from the area near Edgewood Road in Machesney Park toward the area in Rockford where the shooting occurred. When this phone's activity resumed at 8:03 p.m., the activity was consistent with the phone traveling back toward the area of Edgewood Road. Defendant did not object during Raschke's testimony.[3]

¶ 34                     g. *Roberson's Testimony About Her Interactions*

*With Wrancher and Defendant the Day After the Shooting*

¶ 35    Roberson testified that she met with Wrancher on the evening of September 24, 2018. According to Roberson, Wrancher mentioned to her that he might be incarcerated for 25 to 30 years for "something that he was dealing with." Roberson added, however, that Wrancher said that

---

[3] Prior to trial, defendant filed a one-page *pro se* motion *in limine* seeking to limit Raschke's testimony "by barring any information that is not supported by the science of cell site analysis." Defendant did not specify what testimony he wanted to bar, nor did he cite any "science" or other authority in his motion. It seems that the court heard argument on this motion on June 5, 2019, and reserved ruling, as there is an "R" written on the motion. The record on appeal does not contain a transcript of the June 5 proceedings. Defendant did not re-raise the issue at trial.

such incarceration had something to do with "his child's mother." Roberson also testified that Wrancher wanted to drive to the apartment complex where the shooting occurred to see if there was a memorial or any blood at that location. Defendant did not object to Roberson's testimony about Wrancher's statements to her.

¶ 36    Roberson testified that, later on September 24, 2018, she and Wrancher met up with defendant and went to a gas station. Roberson testified that a photograph that appears to have been taken from a surveillance camera was "a fair and accurate representation of how [defendant] appeared on the night of September 24[,] 2018." Defendant is wearing a white t-shirt in this photograph.

¶ 37                                    2. Defendant's Case

¶ 38    Colton Schwach, who was a resident of the apartment complex where the shooting occurred, testified for defendant. Schwach testified that, when he pulled into his parking space on the evening of September 23, 2018, there was one man standing off by some trees and another man across the street 30 to 40 feet away. Schwach saw those men "[v]ery, very briefly." Schwach could say only that the men were black, skinny, and "decently tall." One of the men was pacing back and forth as he talked on the phone, while the other was "pretty much completely staring at the guy on the phone." According to Schwach, the two men were "[v]aguely" "looking in the general direction of each other." The man on the phone walked behind a building. Schwach entered his apartment. When he exited the apartment ten minutes later, he heard two gunshots. He immediately went back into his apartment.

¶ 39    Defendant also called Sean Hughes, who was part of the team of officers that executed the search warrant at defendant's house on October 2, 2018. Hughes testified that defendant was not home at the time of the search, but many other people were. Hughes did not know what the living

arrangements were in the house, such as whether defendant was forbidden from entering other people's bedrooms.

¶ 40    Defendant re-called Ernst as a witness. Ernst testified that, on September 23, 2018, defendant was subject to electronic monitoring as a condition of his parole. Defendant's ankle monitor and the accompanying receiver recorded certain data through a system called AMS. For example, if the ankle monitor were more than 150 feet from the receiver, the records would say "unauthorized leave." If the receiver were unplugged from its power source for more than eight seconds, the records would say "power loss." When it was plugged in again, the records would say "power restore." If the device detected that the receiver was moving, it would record "receiver motion event." When the receiver stopped moving for more than 16 seconds, the records would say "receiver stationary event." According to Ernst, if the system recorded a motion event, that meant that the receiver definitely was moved. However, a lack of a motion event did not definitely mean that the receiver was *not* moved. To that end, Ernst said that it was possible that the system would not record gentle movements, such as "if you're driving gently enough and you didn't jostle the box enough." The system instead would record "jarring motions." The system did not contain a GPS locator.

¶ 41    The records associated with defendant's electronic monitoring device reflected a "power loss," a "receiver motion event," and a "power restore," all at 6:46 p.m. on September 23, 2018. According to Ernst, this indicated that defendant's device was unplugged, moved, and then "plugged into a separate power source" such as an automobile. The next recording for defendant's device was a "receiver stationary event" at 7:34 p.m. Ernst explained that this meant that, between 6:46 p.m. and 7:34 p.m., defendant's device was in constant motion and was constantly powered. The next recording was an "unauthorized leave" at 7:47 p.m., which meant that defendant went

more than 150 feet from the receiver. At 7:57 p.m., defendant came back within 150 feet of the receiver, which was reflected in the records as an "unauthorized enter." Also at 7:57 p.m., the records reflected another "receiver motion event." At 8 p.m., the records indicated a "receiver stationary event," which lasted until 8:36 p.m. At 8:36 p.m., the records indicated a "power loss," a "receiver motion event," and a "power restore." Then, at 8:37 p.m., there was a "receiver stationary event" that lasted until the next day. Ernst testified that this meant that defendant's device was unplugged at 8:36 p.m., was set down somewhere, and was then plugged back in. At the conclusion of Ernst's testimony, the trial court instructed the jury that it could not consider defendant's status as a parolee as evidence of his guilt in this case.

¶ 42                             C. Verdict and Sentencing

¶ 43    The jury found defendant guilty of first-degree murder. The jury also found that defendant personally discharged a firearm that proximately caused Harris's death. Defendant was represented by counsel in connection with posttrial proceedings and sentencing. Due to a firearm add-on, defendant's sentencing range was 45 years to life in prison. The court sentenced defendant to life in prison. Defendant timely appealed.

¶ 44                                II. ANALYSIS

¶ 45    Defendant is represented by counsel on appeal. During the briefing of this appeal, the State moved to strike nine of the citations in defendant's brief, as those materials were not presented to the jury or the trial court. Defendant objected to the State's motion. We took the motion with the case. Having now reviewed the entire record, we determine that it is arguable that defendant improperly uses some of these materials to establish new facts on appeal—such as the quality of the high school that he attended or the distance between Wrancher's home and the scene of the shooting. However, as explained below, none of the four overarching issues that defendant raises

on appeal have merit. Thus, there is no need to strike any of the authorities that defendant cites. Accordingly, we deny the State's motion to strike.

¶ 46                              A. Sufficiency of the Evidence

¶ 47    Defendant first argues that he was not proved guilty beyond a reasonable doubt, as there was no physical evidence linking him to the crime and the circumstantial evidence was "too tenuous." The State responds that the evidence was sufficient.

¶ 48    In assessing the sufficiency of the evidence, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Emphasis in original.) *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). "The *Jackson* standard applies in all criminal cases, regardless of the nature of the evidence." *People v. Cunningham*, 212 Ill. 2d 274, 279 (2004). "A defendant can be convicted solely on circumstantial evidence," and "[t]he trier of fact does not need to be satisfied beyond a reasonable doubt as to each link in the chain of circumstantial evidence." *People v. Saxon*, 374 Ill. App. 3d 409, 417 (2007). We may not reverse a conviction "unless the evidence is so unreasonable, improbable, or unsatisfactory as to create a reasonable doubt of the defendant's guilt." *People v. Cline*, 2022 IL 126383, ¶ 25.

¶ 49    The jury found that defendant committed the offense of first-degree murder by shooting Harris, without lawful justification, and with the intent to kill him or to do great bodily harm. See 720 ILCS 5/9-1(a)(1) (West 2018). Defendant challenges only the element of identity—whether he was the shooter. We hold that a reasonable trier of fact could have found defendant guilty beyond a reasonable doubt, as there was strong circumstantial evidence collectively linking defendant to the shooting.

¶ 50    The evidence showed that Wrancher was present when somebody who was wearing a white shirt shot Harris. Defendant associated with Wrancher, as demonstrated by the testimony of Roberson, who said that the three of them went to a gas station the day after the shooting. A photograph apparently taken the day after the shooting showed defendant wearing a white t-shirt.

¶ 51    Two days after the shooting, Wrancher gave a phone to police officers and consented to a search of that phone. The number listed on the consent-to-search form had a "312" area code. When officers extracted data from this phone, the name of the device appeared as "Jacquala's iPhone," and both Wrancher and Jacquala had email accounts registered to the device. Nevertheless, a reasonable jury could have concluded that this was Wrancher's phone, not Jacquala Roberson's phone. Roberson testified that she provided an iPhone to Wrancher with a phone number that was not from Rockford. The jury also could have believed that Wrancher would have given the police his own phone, not somebody else's phone.

¶ 52    The data that was extracted from the phone that Wrancher gave to police officers showed heavy communication with phone number (815) 975-****, both before and after the shooting. The jury reasonably could have determined that (815) 975-**** was defendant's phone number, because (1) defendant's parole agent testified that this was defendant's number and (2) phone records for this number listed defendant as the subscriber. Thus, the jury reasonably could have believed that Wrancher and defendant communicated by phone both before and after the shooting.

¶ 53    Agent Raschke's historical cell site analysis gave rise to an inference that defendant traveled to Rockford before the shooting and then returned home after the shooting. Raschke's testimony was consistent with Ernst's testimony. Ernst's testimony regarding defendant's electronic monitoring records supported a conclusion that defendant left his home on the evening of the shooting.

¶ 54    Furthermore, upon searching defendant's home, police officers located an empty case for a .45 caliber pistol, along with ammunition that was of the same make and model as the shell casings recovered from the scene of the shooting. Officers also found a credit card reader, which was noteworthy because (1) Epps testified that Harris's meeting with Wrancher pertained to either "credit cards" or "pick[ing up] a bank card" and (2) Wrancher admitted to participating in a scheme with Harris to "crack cards."

¶ 55    Considering the totality of the evidence in the light most favorable to the State, a reasonable jury could have determined that defendant shot Harris. Accordingly, there was sufficient evidence to support defendant's conviction of first-degree murder.

¶ 56    In arguing to the contrary, defendant maintains that the police performed an insufficient investigation. Specifically, defendant notes that (1) there was no historical cell site analysis of Wrancher's phone, (2) there was no testimony that the extraction process of Wrancher's phone worked properly, and (3) officers did not attempt to extract data from other phones that were recovered during the investigation. With respect to defendant's first point, Wrancher admitted to police officers that he was present at the shooting, and Epps also placed Wrancher at the scene. Thus, there was no need to conduct a historical cell site analysis of Wrancher's phone to place him at the scene. Defendant is mistaken on his second point, as Detective Juanez testified that he properly extracted information from Wrancher's phone, and the software identified no errors in the process. With respect to defendant's third point, the totality of the evidence supported a conclusion that two specific phones belonged to the perpetrators. Therefore, the failure to analyze data from other phones did not render the evidence against defendant improbable or unsatisfactory.

¶ 57    Defendant further contends that Roberson, not Wrancher, may have communicated by phone with defendant on the day of the shooting. Defendant also suggests that Roberson may have

been at Wrancher's home during those phone conversations. To that end, without providing a citation to the record, defendant recites an address for Wrancher and then consults Google Maps to demonstrate how close that was from the scene of the shooting. As explained above, a reasonable jury could have concluded that Wrancher, not Roberson, spoke with defendant on the day of the shooting. See *Cline*, 2022 IL 126383, ¶ 41 ("In weighing evidence, the trier of fact is not required to disregard inferences that flow normally from the evidence before it, nor need it search out all possible explanations consistent with innocence and raise them to a level of reasonable doubt.").

¶ 58    Defendant also maintains that (1) the evidence that Wrancher's phone number was (312) 483-**** was inadmissible, and (2) the historical cell site analysis of phone number (815) 975-**** was "junk science." However, evidentiary errors are irrelevant to our analysis of the sufficiency of the evidence. See *People v. Drake*, 2019 IL 123734, ¶ 27 ("[A] reviewing court must consider evidence admitted improperly when determining the sufficiency of the evidence."). Additionally, a defendant may not, under the guise of challenging the sufficiency of the evidence, contest the validity of expert testimony with materials that the jury did not consider. See *Cline*, 2022 IL 126383, ¶ 33 ("It is not the function of a court of review to retry a defendant [citation], nor is it permissible for a reviewing court to take judicial notice of material that was not considered by the trier of fact in weighing the credibility of an expert witness's testimony.").

¶ 59                                B. Severance of Trials

¶ 60    Defendant next argues that his trial should have been severed from Wrancher's trial. In support of his position, defendant argues that two categories of statements that were attributed to Wrancher constituted inadmissible hearsay as to defendant and violated defendant's right to confrontation. The first set of statements that defendant identifies includes Wrancher's admissions to police that he (Wrancher) participated in a credit card scheme with Harris. Defendant asserts

that, at trial, the State improperly introduced Wrancher's statements on this matter as substantive evidence and then relied on them during closing argument. According to defendant, the error was compounded when the trial court gave the jury a limiting instruction that suggested that "the defendants"—not just Wrancher—were involved in the credit card scheme.

¶ 61    The second set of statements that defendant maintains were inadmissible against him were Wrancher's comments to Roberson the day after the shooting that (1) Wrancher might be going away to prison for 25 to 30 years and (2) Wrancher wanted to go to the scene of the crime to see if there were any memorials or blood in the area. Defendant contends that the State relied on these statements as substantive evidence during its closing argument. In this section of his brief, defendant also asserts that the evidence of the ammunition and the empty gun case that were found in defendant's house were irrelevant and should not have been admitted.

¶ 62    The State responds that the trial court acted within its discretion by denying defendant's motion to sever. The State emphasizes that Wrancher never implicated defendant in any crime. The State argues that we should deem defendant's additional evidentiary arguments forfeited, as defendant improperly "intermingles" them with the distinct issue of severance. Forfeiture aside, the State suggests that Wrancher's statements were admissible as statements against penal interests.

¶ 63    Codefendants who are indicted jointly should be tried together, "unless fairness to one of the defendants requires a separate trial to avoid prejudice." *People v. Lee*, 87 Ill. 2d 182, 187 (1981). Generally, a defendant must file a pretrial motion demonstrating the prejudice that would result from a joint trial. *Lee*, 87 Ill. 2d at 186. In deciding whether to sever the trials, "the trial judge must make a prediction about the likelihood of prejudice at trial, taking into account the papers presented, the arguments of counsel, and any other knowledge of the case developed from

the proceedings." *People v. Daugherty*, 102 Ill. 2d 533, 541 (1984). We review the trial court's decision for an abuse of discretion. *Daugherty*, 102 Ill. 2d at 541. In conducting our review of a pretrial decision not to sever trials, we cannot focus on "subsequent events that occurred during the trial." *People v. McCann*, 348 Ill. App. 3d 328, 336 (2004).

¶ 64    The record on appeal does not contain a transcript of the hearing on defendant's motion to sever. Nevertheless, defendant includes in the appendix to his brief transcripts from April 5, 2019—when the court heard arguments on the motion to sever—and April 10, 2019—when the court denied that motion. We must disregard any materials in the appendix that are not included in the record. *Oruta v. B.E.W. & Continental*, 2016 IL App (1st) 152735, ¶ 32. During oral argument, we alerted defendant's counsel to this problem. Defendant subsequently filed a motion to supplement the record with these transcripts (he labeled this as his "Motion for the Court to Reconsider Barring the Severance Issue From Consideration and Asking Leave to Supplement the Record With the Certified Copy of the Hearing Which is Attached in the Appendix"). The State did not file an objection to that motion.

¶ 65    In the transcripts in defendant's appendix, the trial court said that, before ruling on defendant's motion to sever, it reviewed Wrancher's recorded police interview. That recording is not included in the record on appeal. Thus, even if we allowed defendant to supplement the record with the proposed transcripts, we still would lack a complete record to assess whether the trial court abused its discretion by denying defendant's motion to sever. Not having access to all the materials that the trial court considered hinders our ability to evaluate the reasonableness of the court's prediction about whether defendant would be prejudiced by a joint trial. As noted in *Foutch v. O'Bryant*, 99 Ill. 2d 389, 391-92 (1984):

"[A]n appellant has the burden to present a sufficiently complete record of the proceedings at trial to support a claim of error, and in the absence of such a record on appeal, it will be presumed that the order entered by the trial court was in conformity with law and had a sufficient factual basis. Any doubts which may arise from the incompleteness of the record will be resolved against the appellant."

Supplementing the record with the transcripts of the hearing on the motion to sever would not cure the *Foutch* problem. Although we have reviewed the transcripts and will refer to them herein, we decline to order the clerk of the circuit court to engage in the futile act of formally preparing a supplemental record containing the transcripts. See Ill. S. Ct. R. 329 (eff. July 1, 2017) ("The clerk of the circuit court shall prepare a certified supplement to the record which shall be filed in the reviewing court upon order issued pursuant to motion."). Accordingly, we hereby deny defendant's motion to supplement the record.

¶ 66    Aside from the incomplete record, we note that, in his motion to sever, defendant did not clearly establish that the case involved circumstances of the type that usually compel courts to sever trials. Generally, a defendant may suffer prejudice from a joint trial where the State intends to introduce a codefendant's statement that implicates the defendant. *Lee*, 87 Ill. 2d at 187. A defendant may also suffer prejudice from a joint trial where the respective defenses are "so antagonistic that a severance is imperative to assure a fair trial." *Lee*, 87 Ill. 2d at 188. Here, defendant argued that he would suffer both forms of prejudice. However, there was no indication at the hearing on the motion to sever that defendant and Wrancher intended to pursue antagonistic defenses, and defendant does not argue on appeal that their defenses were antagonistic. Additionally, Wrancher's statements to the police, Roberson, and others apparently did not implicate defendant in Harris's shooting, either explicitly or implicitly. See *People v. Paik*, 257

Ill. App. 3d 620, 632 (1993) (affirming the decision not to sever trials where a codefendant's out-of-court statement did not implicate the defendant). Indeed, according to the trial court, Wrancher repeatedly denied to police officers that he knew the shooter.

¶ 67 During the hearing on the motion to sever, defense counsel emphasized that, in text messages to "various people," Wrancher implicated defendant in a credit card scheme. Defense counsel also noted that Wrancher made statements to police officers that could be interpreted as suggesting that Harris's shooting was motivated by that scheme. However, the prosecutor responded that Wrancher's statement implicating defendant in the credit card scheme would not come out at trial unless Wrancher testified, which would take care of any confrontation problem. In connection with the motion to sever, the parties never informed the court that police officers found a credit card reader in defendant's home.

¶ 68 The trial court denied defendant's motion to sever, explaining: "What has been described to me at best would be characterized as a mere apprehension of prejudice." Nevertheless, the court added that it was not foreclosing the defense from revisiting the severance issue "at any time" if there was additional information for the court to consider.

¶ 69 During trial, defendant never asked the court to reconsider its ruling about severance. Nor did defendant object to the State's allegedly improper evidence or remarks. On appeal, to demonstrate prejudice from the court's failure to sever the trials, defendant focuses heavily on events that occurred at trial. For example, defendant challenges the admissibility of certain evidence and highlights comments that the State made during its closing argument. But as mentioned above, "a reviewing court cannot decide the merits of a motion for severance based on subsequent events that occurred during the trial." *McCann*, 348 Ill. App. 3d at 336. The State is correct that many of the contentions that defendant makes in this section of his brief are not directly

related to reviewing the court's pretrial decision not to sever the trials. Moreover, to the extent that defendant complains about a misleading limiting instruction in connection with Engelkens's testimony, defendant invited any error by requesting that instruction. See *People v. Harvey*, 211 Ill. 2d 368, 385 (2004) (the invited-error doctrine precludes a defendant from requesting to proceed in one manner and then arguing on appeal that such course of action was erroneous).

¶ 70                                                   C. Standby Counsel

¶ 71     Defendant also argues that the court should have appointed standby counsel. The State responds that the court acted within its discretion by denying defendant's request for standby counsel.

¶ 72     Although a defendant has the right to self-representation, such right "does not carry with it the right to legal assistance." *People v. Harris*, 2020 IL App (3d) 160169, ¶ 38. Accordingly, "one who chooses to represent himself must be prepared to do so." *Harris*, 2020 IL App (3d) 160169, ¶ 38. Nevertheless, because there is no statute or rule prohibiting the appointment of standby counsel, the trial court may choose to appoint standby counsel for a *pro se* defendant. *People v. Khan*, 2021 IL App (1st) 190679, ¶ 72. In determining whether to do so, relevant criteria include "the nature and gravity of the charge, the expected factual and legal complexity of the proceedings, and the abilities and experience of the defendant." *People v. Gibson*, 136 Ill. 2d 362, 380 (1990). We review for an abuse of discretion a trial court's refusal to appoint standby counsel. *Khan*, 2021 IL App (1st) 190679, ¶ 72. A court abuses its discretion only where its ruling is arbitrary, fanciful, or unreasonable, or where no reasonable person would take the trial court's view. *Khan*, 2021 IL App (1st) 190679, ¶ 72.

¶ 73     Defendant proposes that the trial court "misstated the law when it found that the role of standby counsel was undefined." We determine that the court's remarks were consistent with case

law. We recently cautioned that "appointment of standby counsel frequently creates more problems than it solves." *People v. Hui*, 2022 IL App (2d) 190846, ¶ 63. One reason is that "[t]here is no 'bright line' test regarding the role of standby counsel." *Hui*, 2022 IL App (2d) 190846, ¶ 63 (quoting *People v. Williams*, 277 Ill. App. 3d 1053, 1060 (1996)). Additionally, appointing standby counsel "puts any resulting conviction at risk because of the ambiguity of counsel's role." *Williams*, 277 Ill. App. 3d at 1060. Defendant mentions that our supreme court has said that "[s]tandby counsel may assist a *pro se* defendant 'in overcoming routine procedural or evidentiary obstacles to the completion of some specific tasks, such as introducing evidence or objecting to testimony, that the defendant has clearly shown he wishes to complete' and may also help 'ensure the defendant's compliance with basic rules of courtroom protocol and procedure.' " *People v. Simpson*, 204 Ill. 2d 536, 562 (2001) (quoting *McKaskle v. Wiggins*, 465 U.S. 168, 183 (1984)). However, although standby counsel might permissibly perform a "broad range of activities" (*Gibson*, 136 Ill. 2d at 378), if a trial court chooses to appoint standby counsel, the court must "determine the nature and extent" of such counsel's involvement in the case (*People v. Redd*, 173 Ill. 2d 1, 38 (1996)). Thus, the trial court was correct that the role of standby counsel can differ between cases.

¶ 74    Defendant maintains that the trial court "could have" appointed standby counsel to assist defendant with pretrial matters. The trial court declined to do so, emphasizing the difficulty to a lawyer of having to help defendant with pretrial matters without knowing defendant's whole trial strategy. The court's concerns were reasonable considering the vague nature of defendant's request. Defendant also does not identify any deficiencies in the technical aspects of his pretrial preparation. He filed *pro se* motions seeking discovery, to dismiss charges, to suppress evidence, to bar the State from referencing his criminal history, to limit Raschke's testimony, and to limit

media coverage. Thus, as the State argues, there is no indication that defendant was prejudiced by the denial of standby counsel.

¶ 75    Defendant further argues that the trial court misstated the law when it expressed concerns about the potential difficulty of evaluating standby counsel's performance. The court's concerns were justified. Appointing standby counsel "provides an unsuccessful *pro se* defendant the opportunity to argue on appeal that standby counsel either violated his right to proceed *pro se* or otherwise acted improperly." *Hui*, 2022 IL App (2d) 190846, ¶ 63. Such claims of ineffective assistance often are based on conversations that the trial court "was not and could not be privy to." *Williams*, 277 Ill. App. 3d at 1060. Here, defendant expressed his desire to represent himself at trial without even the presence of counsel, yet he also wanted open-ended pretrial assistance. Appointing standby counsel under these circumstances could have encouraged postconviction allegations that counsel either exceeded her role or performed her role deficiently.

¶ 76    Defendant further asserts that the trial court's comments reflected that it "perfunctorily avoids appointing standby counsel instead of exercising discretion." According to defendant, "[t]he trial court essentially does not believe in the concept of standby counsel and therefore exercises no discretion in any of its cases but instead applies a blanket rule of prohibiting standby counsel." The record does not compel that conclusion. In denying defendant's request for standby counsel, the court said that it recognized that it might be "permitted" in certain circumstances to appoint standby counsel, though the court had "in [its] experience avoided" doing so. In denying defendant's posttrial motion, the court clarified that it had exercised its discretion in denying defendant's request for standby counsel because defendant had not sufficiently "narrow[ed] the scope" of his request. Nothing in the record rebuts the presumption that the trial court knew that it had discretion to appoint standby counsel and that it properly applied the law. See *People v.*

*Ellison*, 2013 IL App (1st) 101261, ¶ 47 (in addressing an argument that the trial court had a blanket policy of denying requests for standby counsel, the appellate court stated that "[t]he trial court is presumed to know and properly apply the law, and there is nothing in the record that affirmatively indicates that the judge did not properly apply the law").

¶ 77 Defendant also argues that the relevant factors identified in *Gibson* (the nature and gravity of the charge, the expected factual and legal complexity of the proceedings, and the abilities and experience of the defendant) weighed in favor of appointing standby counsel. The charges that defendant faced certainly were serious. With respect to the second factor, defendant emphasizes that discovery was voluminous. On the other hand, the case was only moderately complex, both factually and legally. Although the case involved expert testimony, defendant never attempted to challenge that testimony at trial. With respect to the third factor, defendant notes that he had a limited education. On the other hand, he was 26 years old, and he had prior experience with the criminal justice system. See *Harris*, 2020 IL App (3d) 160169, ¶ 39 (in evaluating the *Gibson* factors, the court mentioned that the defendant "had a lengthy and extensive criminal history and, thus, would have had extensive familiarity with the criminal justice system"). A trained attorney may very well have handled the defense differently. Ultimately, however, defendant was able to cross-examine witnesses, present his own case-in-chief, and provide an opening statement and a closing argument. Under the circumstances, the *Gibson* factors did not so overwhelmingly weigh in favor of appointing standby counsel that it rendered the trial court's decision an abuse of discretion.

¶ 78 Finally, defendant asserts that standby counsel could have assisted defendant by "alert[ing] him to Raschke's testimony," preparing questions for defendant to ask witnesses at trial, and advising defendant to make hearsay objections. These tasks are beyond the scope of the assistance

that defendant requested. Defendant assured the trial court that he would not ask standby counsel "any questions about examination or the jury selection process, the closing, opening arguments[,] any of that."

¶ 79                                    D. Sentencing

¶ 80     Defendant finally argues that the court abused its discretion by sentencing him to life in prison. Defendant contends that the court improperly invoked "wrath" as a justification for the sentence. According to defendant, his circumstances did not justify a life sentence. Among the circumstances that defendant mentions are that he was poorly educated, he had a history of substance abuse, and he grew up surrounded by criminals. Defendant also cites the "changing public policy" regarding sentencing young adult offenders, along with the "ongoing neuroscience of young adult brains." Defendant further highlights literature supporting the notions that "[p]eople age out of crime," that prisoners face unique health concerns, and that poverty and systemic racism foster criminality.

¶ 81     The State responds that defendant forfeited some of his specific contentions because he did not raise them below. The State also argues that the court did not abuse its discretion in sentencing defendant to life in prison. According to the State, defendant's public policy points are a matter for the legislature, not the court.

¶ 82     In his reply brief, defendant invokes the closely-balanced-evidence prong of the plain-error doctrine. However, he does not explain why the evidence at the sentencing hearing was closely balanced. See *People v. Hillier*, 237 Ill. 2d 539, 545 (2010) (in the sentencing context, to justify relief under the first prong of the plain-error doctrine, a defendant must show that a clear or obvious error occurred and that "the evidence at the sentencing hearing was closely balanced").

¶ 83    We first address the State's forfeiture argument. Defendant filed a motion challenging his sentence as excessive. Although he raises that same general issue on appeal, he makes points that he did not assert in the trial court. We might be justified in deeming certain points forfeited. We decline to do so, however, as defendant received the most severe penalty under Illinois law, and he argued below that his sentence was unwarranted. We will consider defendant's argument on the merits.

¶ 84    The trial court has broad discretion when imposing a sentence. *People v. Alexander*, 239 Ill. 2d 205, 212 (2010). We accord great deference to the trial court's judgment, as that court has the superior opportunity to observe the proceedings and to weigh the relevant factors. *Alexander*, 239 Ill. 2d at 212-13. We cannot modify a defendant's sentence unless the trial court abused its discretion, which means that "the sentence is 'greatly at variance with the spirit and purpose of the law[ ] or manifestly disproportionate to the nature of the offense.' " *Alexander*, 239 Ill. 2d at 212 (quoting *People v. Stacey*, 193 Ill. 2d 203, 210 (2000)).

¶ 85    Defendant cites the evolving understanding of "young adult" brains and challenges the social justifications for lengthy prison sentences. Those arguments must be directed to the legislature, not the courts. See *People v. McGee*, 2020 IL App (2d) 180998, ¶ 16 (cautioning against questioning the legislature's determinations about the designated penalties for offenses). Defendant's sentencing range was 45 years to life in prison. The trial court imposed a sentence that was authorized by law. The only question is whether the court abused its discretion in doing so.

¶ 86    Defendant had a significant criminal history. According to the presentence investigation report, defendant's juvenile record included receiving probation adjustments for battery, mob action, and theft. As an adult, in February 2011, defendant was sentenced to probation for DUI

and unlawful possession of cannabis with intent to deliver. According to the presentence investigation report, defendant "did not consistently report to [p]robation as directed" before he was arrested for home invasion in April 2011. In January 2014, defendant was sentenced to 15 years in prison for that home invasion, with 1010 days of credit for time served. Defendant was released from prison in August 2018, at the age of 26. Defendant killed Harris one month later. Testimony introduced at defendant's sentencing hearing for first-degree murder showed that, in April 2019, defendant brutally battered a corrections officer in the Winnebago County jail.

¶ 87   In sentencing defendant, the court indicated that it considered all relevant aggravating and mitigating factors, along with defendant's rehabilitative potential. The court mentioned that defendant had "a substantial history of prior delinquency or criminality," he had "not led a law abiding life for a substantial period of time before the commission of the present crime," and he "was on mandatory supervised release at the time of this offense." The court found that defendant's character and attitude made it substantially likely that he would engage in additional criminal conduct if not incarcerated. The court also noted the need for "retribution" to punish defendant for his crime and to deter others by imposing a lengthy prison sentence. According to the court, defendant's conduct in "savag[ely] attack[ing] that correction's [sic] officer" showed who defendant "really [was]." Addressing defense counsel's argument that defendant deserved "mercy," the court stated:

> "And so your attorney eloquently talks about mercy and there is a time and a place for mercy and there is also a time and at [sic] place for what could be characterized as wrath, the other side of the coin of justice, punishment and that is that time [sic] for punishment not for mercy. You do not deserve mercy."

The court added that the seriousness of the crime was "one of the most important things for the Court to consider," along with the need to deter others. The court imposed a sentence of life in prison.

¶ 88 We hold that the sentence was not an abuse of discretion. The court considered all relevant factors and explained the bases for its decision. We cannot say that a life sentence was greatly at variance with the spirit and purpose of the law or that the sentence was manifestly disproportionate to the nature of the offense. Defendant criticizes the court's comment about "wrath," but we see no error. In proper context, the court used the word "wrath" to refer to the need for punishment, and the court was responding to defense counsel's request for "mercy." See *People v. Brown*, 2019 IL App (5th) 160329, ¶ 22 (in rejecting an argument that the trial court considered an improper factor at sentencing, the appellate court focused on the context in which the comment was made and refused to "twist the trial judge's words").

¶ 89                                III. CONCLUSION

¶ 90 For the reasons stated, we affirm the judgment of the circuit court of Winnebago County.

¶ 91 Affirmed.